**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHELSEA WILLIAMS and**<br>**NICHOLAS WILLIAMS,** | : |
| | : |
| **Plaintiffs,** | : |
| **v.** | : **3:13-CV-02945** |
| | : **(JUDGE MARIANI)** |
| **JOHN GILGALLON, et al.,** | : |
| | : |
| **Defendants.** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On December 9, 2013, Plaintiffs Chelsea Williams and Nicholas J. Williams filed a

Complaint against Defendants John Gilgallon, Dean Argenta, and the Borough of Olyphant

("Olyphant Defendants"). (Doc. 1). Plaintiffs filed an Amended Complaint on March 14,

2014 against the Olyphant Defendants, also adding as defendants Officer Katie Fallon,

Officer Mackey, and the Borough of Dickson City. (Doc. 10). Upon consideration of a

Motion to Dismiss the Amended Complaint filed by the Olyphant Defendants (Doc. 17), a

Motion to Dismiss the Amended Complaint filed by Dickson City (Doc. 29), and related

briefs, United States Magistrate Judge Carlson issued a Report and Recommendation on

February 24, 2015 (Doc. 46). The Court adopted the Report and Recommendation by way

of Order dated March 30, 2015, dismissing some counts of the Amended Complaint,

allowing others to proceed, and dismissing still others with leave to amend. (*See* Doc. 48).

Plaintiffs filed a Second Amended Complaint on April 13, 2015 (Doc. 49). On April 29, 2015, the Olyphant Defendants[1] filed a Motion to Dismiss Count IX of the Second Amended Complaint (Doc. 54). By way of a Memorandum (Doc. 93) and Order (Doc. 94) dated February 12, 2016, the Court granted the Olyphant Defendants' Motion, dismissing Count IX with prejudice as to the Borough of Olyphant and dismissing it without prejudice and with leave to instead allege a claim for malicious prosecution as to Defendant Argenta. On February 19, 2016, Plaintiffs filed a Third Amended Complaint (Doc. 95), in which Count IX is now a claim for malicious prosecution.

After the Olyphant Defendants filed their Motion to Dismiss Count IX of the Second Amended Complaint (Doc. 54), but before the Court ruled on it, the Olyphant Defendants also filed a Motion for Summary Judgment (Doc. 70), which is presently pending before the Court. In the Motion, the Olyphant Defendants move for summary judgment on all claims against them that were advanced by Plaintiffs in the Second Amended Complaint, including Count IX. Though this Motion for Summary Judgement (Doc. 70) was filed while the Second Amended Complaint was the operative complaint in this case, and though the Second Amended Complaint has since been superseded by the Third Amended Complaint, the Olyphant Defendants have not notified the Court that they wish to withdraw or to supplement their Motion for Summary Judgment and related briefing in light of the new malicious prosecution claim in Count IX in Plaintiffs' most recent pleading. Additionally, the

---

[1] By way of previous Order, this Court dismissed Defendant John Gilgallon from the action. (Doc. 48 at 1). As such, the remaining Olyphant Defendants are Dean Argenta and the Borough of Olyphant.

dispositive motion deadline has long since expired. (See Case Management Order, Doc. 67). Thus, the Court will consider the Motion for Summary Judgement (Doc. 70) to be seeking judgment in the Olyphant Defendants' favor on all claims against them in the Third Amended Complaint, with the exception of Count IX.

The Olyphant Defendants' Motion for Summary Judgment (Doc. 70) has been fully briefed and is ripe for decision. For the reasons set forth below, the Court will grant the Motion for Summary Judgement (Doc. 70) with respect to the Borough of Olyphant and deny it in part and grant it in part with respect to Defendant Argenta.

## II. FACTUAL BACKGROUND

As is required by Local Rule 56.1, the Olyphant Defendants have submitted a Statement of Material Facts (Doc. 71) ("SMF") as to which they submit there is no genuine issue for trial. Plaintiffs subsequently submitted their response to the Olyphant Defendants' SMF, which included a Counter-Statement of Material Facts (Doc. 84). Before reciting the facts it has extracted from these submissions with painstaking care, the Court wishes first to comment on the purpose of summary judgment, the Court's role in deciding summary judgment motions, the Court's expectations from litigants at this stage.

"[T]he underlying purpose of the [summary judgment] rule [ ] is to avoid a trial 'in cases where it is unnecessary and would only cause delay and expense.'" Ullrich v. U.S. Sec'y of Veterans Affairs, 457 F. App'x 132, 136 (3d Cir. 2012) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)). In executing its responsibility to

determine from a paper record whether trial of a given plaintiff's claims is unnecessary, the

Court must be mindful of the requirement of Federal Rule 56 that the movant must show

"that there is no genuine dispute *as to any material fact* and the movant is entitled to

judgment *as a matter of law*." (Emphasis added). As the Third Circuit has stated,

> [w]hen deciding a motion for summary judgment, a district court's role
> remains circumscribed in that it is inappropriate for a court to resolve factual
> disputes and to make credibility determinations. *Country Floors Inc. v.
> Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir.
> 1991). Even where a case will be heard without a jury, the court on summary
> judgment does not sit as the trier of fact; it only determines whether there are
> issues which must be tried. *Medical Inst. of Minnesota v. National Ass'n of
> Trade and Technical Schools*, 817 F.2d 1310, 1315 (8th Cir. 1987). To raise
> a genuine issue of material fact the opponent need not match, item for item,
> each piece of evidence proffered by the movant. *Big Apple, BMW, Inc. v.
> BMW of N. Am. Inc.*, 974 F.2d 1358, 1362–63 (3d Cir. 1992), *cert. denied*,
> 507 U.S. 912 (1993). In practical terms, if the opponent has exceeded the
> "mere scintilla" threshold and has offered a genuine issue of material fact,
> then the court cannot credit the movant's version of events against the
> opponent, even if the quantity of the movant's evidence far outweighs that of
> its opponent. *Id.* It thus remains the province of the factfinder to ascertain
> the believability and weight of the evidence. *Id.*

*In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 433 n.10 (3d Cir. 1996).

Given these principles of summary judgment adjudication, the Court expresses

incredulity as to whether, if they took these principles into account, the moving Defendants

could truly believe that this is a case in which they are entitled to summary judgment on all

claims against them. At its core, this is an excessive force case that, in terms of evidence,

is almost entirely dependent on the recollections of the various witnesses to the events of

the evening of June 23, 2012 as to who did what, to whom, and when. The Court cannot

simply credit the Olyphant Defendants' version of events, constructed as it is through an amalgamation of Defendant Argenta's deposition testimony and portions of the testimony of others, over the versions of events of the Plaintiffs, the other Defendants, or nonparty witnesses. There are a myriad of stories that can be told from the record evidence about the night of June 23, 2012, with the main actors' motivations ranging from benign to indefensible, on all sides. Thus, the case itself is not well-suited to adjudication on summary judgment.

But, what is more, some of the Olyphant Defendants' individual assertions of material fact truly do not belong in a document that's purpose is to set forth *undisputed* facts; that is, facts as to "which the moving party contends there is no genuine issue to be tried." Local Rule 56.1 "Motions for Summary Judgment." Unfortunately, the Olyphant Defendants have not followed this Rule, to the detriment of their Counsel's credibility. For instance, while Defendants assert with citation to record evidence that "Officer Argenta did not tase Nick or Chelsea at any time . . ., (Doc. 71 at ¶ 29), they must also know that there is deposition testimony that they themselves have put into the record where other individuals testify that Defendant Argenta *did* tase Nicholas and/or Chelsea Williams. (*See* Doc. 71, Ex. 1 at 33, 43). Furthermore, they must also know that a determination of credibility – the question of whom to believe – is for the factfinder and not for the Court on summary judgment. *See In re Unisys Sav. Plan Litig.*, 74 F.3d at 433 n.10.

5

Additionally, the moving Defendants presentation of its assertion of material facts

has needlessly complicated this Court's review of their Motion.  Local Rule 56.1, "Motions

for Summary Judgment," reads as follows:

> A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

> Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

"The purpose of this rule is to 'structure a party's summary judgment legal and

factual theory into a format that permits and facilitates the court's direct and accurate

consideration of the motion.'"  *Hartshorn v. Throop Borough*, No. 3:07-CV-01333, 2009 WL

761270, at *3 (M.D. Pa. Mar. 19, 2009) (quoting *Gantt v. Absolute Machine Tools, Inc.*, No.

1:06–CV–1354, 2007 WL 2908254, at *3 (M.D. Pa. Oct. 4, 2007).  Here, the moving parties,

the Olyphant Defendants, have not presented the Court with Local Rule 56.1 papers that

facilitate the Court's consideration of Defendant's Motion for Summary Judgment.  The

Court wishes to make clear that in a statement of facts it does not expect to see again

paraphrases, summaries, characterizations, interpretations, or amalgamations of testimony

where depositions are available and may be quoted verbatim or referred to in discrete

pieces. This case depends upon the ability of the numerous witnesses to the events of

June 23, 2012 to recall accurately what they saw and upon the factfinder's decision on

whom to credit. As such, the testimony of these various witnesses represents the vast

majority of the record evidence and is critically important in determining whether a genuine

dispute of material fact exists. While the Olyphant Defendants do, at times, quote directly

from the deposition testimony, (see, e.g., Doc. 71 at ¶¶ 33-34), or break their factual

assertions into "separate, short and concise statement of the material facts, in numbered

paragraphs," (see Doc. 71 at ¶ 37), much of the Olyphant Defendants' Statement of Material

Facts are summaries of a multiplicity of deposition testimony from different individuals,

constructed with a liberal hand to favor the Olyphant Defendants.

Except where expressly noted as disputed, the following facts of record are

undisputed.

Plaintiffs Chelsea and Nicholas Williams (hereinafter "Chelsea" and "Nicholas,"

respectively) were married on June 23, 2012 and then proceeded to a reception at the

Montdale Country Club. (Defendants' SMF, Doc. 71 at ¶ 1; Plaintiffs' Response, Doc. 84 at

¶ 1). Nicholas drank alcohol on the day of his wedding. (Id. at ¶ 2).[2] The Olyphant

---

[2] With respect to SMF ¶ 2 and numerous other assertions of fact, Plaintiffs begin their response
with the following: "Objection pursuant to Rule 56 (c)(2) of the Federal Rules of civil Procedure. This
answer is provided without waiver of said objection." (Doc. 84 at ¶ 2). Rule 56 (c)(2) provides that "[a]
party may object that the material cited to support or dispute a fact cannot be presented in a form that

7

Defendants cite to the deposition testimony of various guests, including Angella Grunza and Nathan Brower, for the assertions that Nicholas was very intoxicated, loud, aggressive, vulgar, touchy-feely, obnoxious, slurring his speech, acting outrageously, and asking for cocaine, (Doc. 71 at ¶ 2), though the Plaintiffs point to other portions of deposition testimony to undercut these accounts of Nicholas's behavior, such as Angella Grunza's testimony that she "wasn't really around [Nicholas] too much," (Doc. 84 at ¶ 2).

The reception ended and Chelsea travelled to Melinda Brower's home, while Nicholas travelled in a separate car. (Doc. 71 at ¶ 3; Doc. 84 at ¶ 3). Katie Grunza was driving the car that Nicholas was in, with Nicholas seated in the front passenger seat with Angella Grunza, Chelsea's sister, seated on his lap; the rest of the occupants were in the back seat. (*Id*. at ¶ 4). Angella Grunza testified at her deposition that Nicholas tried to inappropriately touch her several times in the car and that she repeatedly tried to push him away. (*Id*. at ¶ 6).[3] The car that Nicholas was riding in was stopped by Olyphant Police

---

would be admissible in evidence." For their repeated Rule 56 (c)(2) objections, Plaintiffs do not specify on what grounds they believe the Olyphant Defendants' cited materials are inadmissible or often what particular portions of that cited material they believe is inadmissible. The Court will not review each and every statement of fact objected to for all possible grounds upon which they may be inadmissible when Plaintiffs themselves have not attempted to support their objections. Furthermore, the Court is not in a position to review the admissibility of this evidence at trial. For instance, to the extent Plaintiffs are raising hearsay objections to the materials cited, the Olyphant Defendants may be able to produce these declarants at trial. *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) ("[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial.") (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Company*, 998 F.2d 1224, 1234 n.9 (3d Cir.1993)).

   [3] Plaintiffs admit SMF ¶ 6 in part and deny it in part. (Doc. 84 at ¶ 6). The Court has reviewed Plaintiffs' response, the deposition transcript cited by the Olyphant Defendants, (Doc. 71, Ex. 7 at 19-22), and the overlapping section cited by Plaintiffs (Doc. 80, Ex. 3 at 19-21), and has noted here only the portions of SMF ¶ 6 as to which there is no genuine dispute. The Court notes that this is an example of a

Officer Michael Crowley approximately one block from the Browers' home because it had too many occupants. (*Id*. at ¶ 5). Officer Crowley told the occupants they would have to travel home with a safe number of occupants in the vehicle. (*Id*. at ¶ 7). Officer Crowley testified at his deposition that at the time of the traffic stop, Nicholas "had glassy, bloodshot eyes" and the odor of alcohol emanating from his person. (Doc. 71 at ¶ 7; Doc. 84 at ¶ 7). During the stop, Nicholas said, "fuck all of you," (*id*.),[4] which Officer Crowley testified was directed to the passengers inside the vehicle, (Doc. 71, Ex. 13 at 38, lines 16-19).

After arriving at the home of the Browers, Chelsea waited in her car with the children until Nicholas arrived; it is unclear if Nicholas traveled there in the car with Katie Grunza or if he walked from the traffic stop to the home of the Browers. (*Id*. at ¶ 8).

After arriving at the Browers' home, Nicholas became involved in an argument with Melinda Brower that escalated quickly into a physical fight with Nicholas punching Melinda in the face twice and drawing blood after she confronted him about attempting to sexually

---

factual assertion where the Olyphant Defendants could have greatly aided the Court's direct and accurate consideration of their Motion but failed to do so. Simply by framing SMF ¶ 6 in terms of Angella Grunza's testimony would have greatly aided the Court's ability to expeditiously and accurately review of the proposed facts in SMF ¶ 6 and Plaintiffs' responses thereto. This issue occurs throughout the SMF. Thus, where necessary to accurately reflect what fact is undisputed by the parties, the Court has reframed statements of material fact in terms of to what various individuals *testified*.

[4] Plaintiffs admit SMF ¶ 7 in part and denies it in part. (Doc. 84 at ¶ 7). The Court has reviewed Plaintiffs' response, which is supported by record evidence, and the deposition transcripts cited by the Olyphant Defendants, (Doc. 71, Ex. 7 at 22-23; Ex. 13 at 39, 94-95), and has noted here only the portions of SMF ¶ 7 as to which there is no genuine dispute.

touch her sister Angella Grunza in the car during the trip from the reception; Nicholas

replied to Melinda, "I will touch your pussy too." (Doc. 71 at ¶ 9).[5]

Nicholas then fought with Nathan Brower; the altercation involved Nathan Brower

"tacking [sic] Nick to the ground" and Nick grabbing Nathan's head and refusing to let go.

(Id. at ¶ 10).[6] It is unclear from the Olyphant Defendants' statement of material fact, (id.),

Plaintiffs' response thereto, (Doc. 84 at ¶ 10), and the parties' respective citations to the

record 1) whether another person was involved in the altercation between Nicholas and

Nathan Brower and, if so, who that person was; 2) how the fight came to occur; and 3)

exactly where in the vicinity of the Brower house it occurred.

Nathan Brower disengaged from Nicholas as a police presence arrived on scene;

Nathan Brower testified in his deposition that Nicholas then "got up screaming that he was

---

[5] Though Plaintiffs respond by admitting in part and denying in part SMF ¶ 9, the Court has
reviewed their response, (Doc. 84 at ¶ 9), and finds that no part of it constitutes a genuine denial. Plaintiffs
admit that "after arriving at the Brower's [sic] home, Nicholas Williams became involved in an argument with
his sister-in-law Melinda Brower." (Id.) By way of further response, Plaintiffs state that "the testimony as to
any physical interaction or boorish statements between Nicholas Williams and Melinda Brower are highly
irrelevant, non-probative, prejudicial, and inadmissible especially in light of the fact that Nicholas Williams
was never charged criminally with this purported conduct and same has no relationship to the excessive
force claim and other claims against the Defendants." (Id.). Plaintiffs' response contains neither citation to
record evidence, nor a challenge to the credibility or accuracy of the record evidence cited by the Olyphant
Defendants. (Id.). The Court deems Plaintiffs to have admitted SMF ¶ 9.

[6] Plaintiffs respond by admitting in part and denying in part SMF ¶ 10. SMF ¶ 10 reads, "Nick then
fought with Nathan Brower and another man identified only as "Bubb" who were angry that Nick had
punched Melinda. This fight occurred on the lawn of the Brower home, extended into the lawn of the
neighboring home, and involved Nathan tacking [sic] Nick to the ground who grabbed Nathan's head and
refused to let go." Plaintiffs admitted that "Nicholas Williams and Nathan Brower had a physical altercation
. . . ." (Doc. 84 at ¶ 10). Plaintiffs' response does not address the assertions that Nathan tackled Nicholas
or that Nicholas then grabbed Nathan's head and refused to let go. (See id.). Additionally, the record
citations offered by the Plaintiffs do not call these assertions into question. Thus, the Court will deem these
asserted facts admitted.

going to kill [Nathan Brower] and – he was, like, losing his mind and screaming." (Doc. 71

at ¶ 11).[7]

Nathan Brower further testified that Nicholas

was screaming. The cops came over and he was, like, 'I'll fucking kill you.' And I'm going to say, he was just screaming that over and over again. And the cop was like 'please calm down. Please calm down.' And he was like – he said, 'fuck you.' He said, 'I'll blow up your police station. I'll fuck all your wives.' And the cop was like, 'please stop.'

(Doc. 71 at ¶ 12; Doc. 84 at ¶ 12).[8]  Nathan Brower also testified that "you'd have to

know him to see it. But the anger. Like he gets so angry, it's scary. And when he's

screaming like that, it's– he's like, I'm going to fucking kill you." (*Id*.).

Defendant and Olyphant police officer Dean Argenta testified that he arrived on

scene with his lights and siren activated and directed his spotlight on the crowd; according

to Argenta, people were yelling and there were several individuals in the street. (Doc. 71 at

---

[7] Though Plaintiffs deny SMF ¶ 11 in its entirety, the Court has reviewed their response, (Doc. 84 at ¶ 11), and the evidence cited by both the Olyphant Defendants and Plaintiffs and finds that there is no genuine dispute as to whether Nathan Brower disengaged from Nicholas as a police presence arrived or that Nathan Brower testified that Nicholas "got up screaming that he was going to kill [Nathan Brower] and – he was, like, losing his mind and screaming."  However, in so doing, the Court has discovered that the Olyphant Defendants have liberally, or carelessly, construed their cited evidence as providing support for portions of their SMF ¶ 11.  The assertion that there were "up to twenty bystanders" present as police arrived when made in connection with assertions about the altercation between Nicholas and Nathan Brower is misleading.  The figure of "up to twenty bystanders" comes from the Deposition of Officer Crowley, (Doc. 71, Ex. 13 at 93), who, by his own testimony, did not arrive on scene until Nicholas was in the back of a vehicle after an altercation with Argenta. (*Id*. at 54-55).  Such use of the record is improper in a statement of material facts.  The Court also notes that despite their reference thereto, no Tab "I" has been filed of record in this case by Plaintiffs. (*See* Docs. 80-82).

[8] Though Plaintiffs admit in part and deny in part SMF ¶ 12, their response includes the statement that "[i]t is admitted that the statements attributable to Nicholas Williams were only testified to by Nathan Brower, . . . ." (Doc. 84 at ¶ 12).  Despite extraneous citations to other portions of the record, this is all that SMF ¶ 12 purports to assert and thus the Court deems SMF ¶ 12 admitted in its entirety.

¶ 13).[9]  Plaintiffs dispute any implication in SMF ¶ 13 that a fight was ongoing at the time that Defendant Argenta arrived.  (*Id.*; Doc. 84 at ¶ 13).

Nicholas walked towards or charged Defendant Argenta's patrol vehicle with foam coming out of his mouth.  (Doc. 71 at ¶ 14).[10]  Defendant Argenta testified that he told Nicholas to "stop. Get back."  (Doc. 71 at ¶ 15; Doc. 84 at ¶15).  Officer Argenta then struck Nicholas on the left thigh with his expandable baton.  (*Id.*).

The Olyphant Defendants next assert that Nicholas ran to and got into "Chelsea Williams' vehicle," (Doc. 71 at ¶ 15), while Plaintiffs point to testimony from Chelsea that, after Argenta hit Nicholas, she grabbed Nicholas and walked him to the vehicle, shutting the car door after he had entered, (Doc. 84 at ¶ 15).

Defendant Argenta put the baton away and then approached the car that Nicholas had gotten into.  (Doc. 71 at ¶ 16; Doc. 84 at ¶ 16).

---

[9] While Plaintiffs deny SMF ¶ 13 in its entirety, (Doc. 84 at ¶ 13), this statement included by the Court in Part II.A. represents the portions of SMF ¶ 13 that are both supported by the record evidence cited by the Olyphant Defendants and cannot reasonably be denied by Plaintiffs, who have directed the Court to the same portion of Defendant Argenta's testimony as did the Olyphant Defendants.

[10] While Plaintiffs deny SMF ¶ 14 in its entirety, the Court has reviewed Plaintiffs' response and deems admitted the portions of the statement included above in Part II.A. Plaintiffs argue that the section of Nathan Brower's testimony cited in support of some of the assertions in SMF ¶ 14 actually refers to a later incident. (Doc. 84 at ¶ 14).  However, the assertion that Nicholas charged Argenta's patrol car is drawn from Argenta's deposition as cited by the Olyphant Defendants, which Plaintiffs do not address in their response and thus cannot reasonably be said to have denied. Furthermore, while Plaintiffs assert that, rather than charging the police vehicle, Nicholas stood in the street with Argenta, had a verbal exchange with him, and was not physically aggressive towards him, (Doc. 84 at ¶ 14), a review of the record evidence cited by Plaintiffs does not bear out this assertion.  The Court notes that while one page of Argenta's testimony cited to by the Olyphant Defendants refers to Nicholas 'charging' the patrol car, the other cited page indicates that he 'walked' towards Argenta and the car. (*See* Doc. 71, Ex. 3 at 28, 36).

Nicholas's aunt Barbara and his three children were in the vehicle at the time. (*Id.*).

Defendant Argenta testified that he asked Barbara to remove the children from the vehicle,

(Doc. 71 at ¶16); however, Plaintiffs' apparently dispute that Defendant Argenta ever did so

and that Barbara and the children ever exited the car, (Doc. 84 at ¶ 16). Barbara testified in

her deposition that no law enforcement officer ever asked her to take the children out of the

vehicle and that she and the children "sat in the car the whole time." (Doc. 81, Ex. 7 at 16).

Officer Crowley arrived on scene. (Doc. 71 at ¶ 17).[11] Officer Argenta and Officer

Crowley conferred and decided to arrest Nicholas for his drunken and disorderly behavior,

approaching the car and ordering him out. (Doc. 71 at ¶ 18; Doc. 84 at ¶ 18).

After refusing to exit the car, Nicholas informed Officer Crowley that he would get out

because Officer Crowley was there. (Doc. 71 at ¶ 19; Doc. 84 at ¶ 19).[12] Nicholas exited

the vehicle and was then advised that he was under arrest. (Doc. 71 at ¶ 20; Doc. 84 at ¶

20). The parties dispute what happened next; Defendants claim that Nicholas shoved

Defendant Argenta, who then took Nicholas to the ground by hand and began to struggle

with in order to effect the arrest, (Doc. 71 at ¶ 20), while Plaintiffs deny these claims, (Doc.

84 at ¶ 20). In part, Plaintiffs cite to testimony from Chelsea that, after Nick got out of the

---

[11] SMF ¶ 17 reads as follows: "At this point, Officer Michael Crowley arrived on the scene and identified Nick as the individual who had been unruly at the earlier traffic stop of Katie Grunza's cars." While Plaintiffs deny SMF ¶ 17 in its entirety, (Doc. 84 at ¶ 17), after a review of their response, the Court finds that they do not appear to actually deny or otherwise dispute the portion of SMF ¶ 17 that indicates Officer Crowley arrived on scene.

[12] Plaintiffs admit in part and deny in part SMF ¶ 19. This statement included by the Court in Part II.A. represents the portions of SMF ¶ 19 that are either admitted by Plaintiffs or supported by the record evidence and not properly denied by Plaintiffs.

13

car, "he got whacked maybe one, two – two times with the black baton" on the "lower body." (Doc. 84 at ¶ 20; Doc. 80, Ex. 1 at 31-32).

Officer Argenta testified that Nicholas ended up on the ground "more on his knees sitting, not face flat on the ground." (Doc. 71 at ¶ 21; Doc. 84 at ¶ 21). Based on the testimony of Officer Argenta, the Olyphant Defendants assert that Officer Mackie took the right side of Nicholas and, along with Officer Argenta, ordered him to stop resisting. (Doc. 71 at ¶ 22).

Plaintiffs, however, deny that Officer Mackie assisted Officer Argenta, (Doc. 84 at ¶ 22), pointing to Officer Mackie's testimony that "[t]he only interaction I had with Mr. Williams was after he was in custody. I assisted in placing him in the police vehicle for transport," (Doc. 71, Ex. 11 at 17-18).

The record is unclear as to when Officer Fallon and Officer Mackie each arrived on scene. For instance, in contrast to Defendant Argenta's testimony, *supra*, Officer Fallon testified in her deposition that she arrived on scene before Officer Mackie and that she assisted in taking Nicholas into custody. (Doc. 71, Ex. 12 at 15; *see also* Doc. 84 at ¶ 22).

Officer Argenta testified that Nick was "growling. Making all kind of like moans and . . . . He was so tensed up if I would have let go of him at any time one of us would have definitely got hurt. There's not a doubt in my mind. He was ready to flare. We were trying to take his hands. He was resisting every bit of the way. There was no way that if myself or Officer Mackie took our hands off him that we were going to get him back in the little control

14

we had." (Doc. 71 at ¶ 23; Doc. 84 at ¶ 23). Plaintiffs deny the veracity of this testimony.

(Doc. 84 at ¶ 23).

Officer Fallon testified that Nick was "refusing to . . . put his hands behind his back,

stay on the ground. He kept attempting to get up and push off the officers and get away

from them. He was swinging his arms. He was yelling and screaming. He was being

belligerent. He would not calm down. He would not comply to several, multiple commands

to put his hands behind his back . . . . He was swinging his arms at them, trying to get away

from them, trying to push off the ground and the car that he was up against." (Doc. 71 at ¶

23; Doc. 84 at ¶ 23).

Nathan Brower testified that:

> The cops are on top of Nick trying to restrain him, get him to the ground and
> put his hands behind his back. And Mindy's [Melinda] standing right there
> with Chelsea. And then Chelsea runs over like screaming and trying to – she
> went and tried to kick them and Mindy grabbed her from behind and was
> holding her by the waist. And Chelsea was just like using Mindy to throw her
> legs and tried to kick the cops anyway. And for a week she couldn't feel her
> arm because Chelsea was biting her arm so hard. She bit a hole in her – like
> bit her arm to where, like, she couldn't bend her fingers trying to get out of her
> thing, to go after the cops.

(Doc. 71, Ex. 9 at 18-19; *see also* Doc. 71 at ¶ 24). Plaintiffs deny that Chelsea kicked any

officer or anyone else. (Doc. 84 at ¶ 24).

Officer Crowley told Chelsea to "stay back, stay back." (Doc. 71 at ¶ 24; Doc. 84 at ¶

24). Officer Crowley held Chelsea, advising her "please do not get involved." (Doc. 71 at ¶

25; Doc. 84 at ¶ 26).[13] He testified during his deposition that, "Mrs. Williams was attempting to interfere with the arrest" of Nicholas and was "[a]t one point probably inches away" from the officers arresting Nicholas. (Doc. 71, Ex. 13 at 62; *see also* Doc. 71 at ¶ 25).[14]

Several members of the wedding party and/or other bystanders began advancing on and yelling at the officers. (Doc. 71 at ¶ 26; Doc. 84 at ¶ 27). Officer Crowley ordered these individuals to stay back or he would tase them. (Doc. 71 at ¶ 26; *see also* Doc. 71, Ex. 13 at 64, 98-99).[15]

Officer Argenta testified, "I felt someone on my back scratching my eyes and my face." (Doc. 71, Ex. 3 at 44). The Olyphant Defendants assert that Chelsea jumped on

---

[13] The Court notes that Plaintiffs' Response to Defendants' SMF (Doc. 84) has forty-seven numbered responses, while the SMF itself has only forty-six. After reviewing Plaintiffs' Response in conjunction with the SMF, it appears that Paragraph 25 of Plaintiffs' Response is misplaced, unresponsive to SMF ¶ 25, and unnecessary overall. Thus, the Court has not considered this Paragraph and has treated Paragraphs 26 through 47 of Plaintiffs' Response as responsive to Paragraphs 25 through 46 of the Olyphant Defendants' SMF, respectively.

[14] SMF ¶ 25 reads as follows, "[w]hen Chelsea belligerently raced to within one foot of Officer Argenta and attempted to interfere with the arrest of Nick, Officer Crowley pulled her away from the situation by 'holding her arms trying to keep her back, and I was advising her, "Please, do not get involved."'" Plaintiffs admit this assertion in part and deny it part, responding that "[i]t is admitted that Officer Crowley held Chelsea Williams and **was** advising her 'please do not get involved.' It is specifically denied that Chelsea Williams **belligerently raced to within one foot of . . . Argenta and attempted to interfere with the Arrest of Nick**. There is no factual support for this assertion by the Borough of Olyphant in the referenced pages of Defendant Fallon or Officer Crowley." (Doc. 84 at ¶ 26) (emphasis original). Plaintiffs offer no citations to record evidence. (*Id.*). Again, this is another instance where the format of the Olyphant Defendants' SMF has needlessly complicated the Court's analysis of their Motion. The Court has reviewed the record evidence cited by these Defendants and finds that the characterization of Chelsea as 'belligerently racing' towards the officers is unsupported. Plaintiffs appear to have taken umbrage with this editorialization and thus denied the proffered assertion that "Chelsea belligerently raced to within one foot of Officer Argenta and attempted to interfere with the arrest of Nick." However, review of the cited record evidence does support the portion of this assertion that claims Chelsea was within a foot or inches of the officers and that she attempted to interfere with the arrest. Thus, the Court will deem this portion of SMF ¶ 25 admitted. Had the Olyphant Defendants constructed a cleaner and simpler SMF ¶ 25 in the first instance, the Court's analysis would not have been nearly as involved.

[15] Plaintiffs fail to address the actions or statements attributed to Officer Crowley in SMF ¶ 26, (*see* Doc. 84 at ¶ 27); thus, the Court deems them admitted.

Officer Argenta's back and began "scratching [his] eyes out," (Doc. 71 at ¶ 27), but Plaintiffs

deny that she "ever jumped onto the back of Argenta and began scratching his eyes," (Doc.

84 at ¶ 28).

The Olyphant Defendants assert that Officer Fallon tased Nicholas after warning him

several times that she would do so if he did not stop resisting arrest, (Doc. 71 at ¶ 28), but

Plaintiffs deny this, pointing to testimony that it was Officer Argenta who tased Nicholas,

(Doc. 84 at ¶ 29).[16]

Officer Mackie assisted in placing Nicholas in a police vehicle. (Doc. 71, Ex. 11 at

17-18; see also Doc. 71 at ¶ 28).[17]

Officer Mackie testified that when he informed Chelsea that she was under arrest,

> she began to physically resist. She was flailing her arms. She was kicking,
> screaming, yelling . . . attempting to pull her arms out of mine and Officer
> Argenta's grasp. She was attempting to drop her body weight to the ground.
> The entire time, we were giving her clear and concise commands to stop
> resisting arrest and to place her hands behind her back. I gave her those
> commands a minimum of ten times. She never, never ceased in her resistive
> actions. She continued to resist and began to falter at one point when I was
> attempting to place her left hand behind her back to be handcuffed by
> attempting to bite my left hand.

---

[16] SMF ¶ 28 also asserts that after Officer Fallon tased Nicholas, "Officer Mackie was able to
handcuff Nick with his handcuffs, [and] get him to his feet . . . ." (Doc. 71 at ¶ 28). Indeed, Defendant
Argenta testified that Nicholas "was placed in cuffs by Officer Mack[ie]." (Id. (citing Doc. 71, Ex. 3 at 39)).
Plaintiffs do not address this portion of the SMF, (Doc. 84 at ¶ 29), and the Court would thus be justified in
deeming this part of SMF ¶ 28 admitted. However, the Court will not do so given that it has previously
been directed to Officer Mackie's own testimony that "[t]he only interaction [he] had with Mr. Williams was
after he was in custody. I assisted in placing him in the police vehicle [ ] for transport." (See Doc. 71, Ex.
11 at 17-18).

[17] Plaintiffs fail to address whether Officer Mackie placed Nicholas in the patrol car as asserted by
the Olyphant Defendants in SMF ¶ 28, (see Doc. 84 at ¶ 29); thus, the Court deems this fact admitted.

(Doc. 71 at ¶ 30; Doc. 84 at ¶ 31). Officer Argenta testified that after Nicholas was handcuffed, he went over to where other police officers had Chelsea against a police vehicle and advised her to "stop resisting, stop resisting, stop resisting." (Doc. 71 at ¶ 30; Doc. 84 at ¶ 31). Plaintiffs admit that Officer Mackie and Officer Argenta testified as such, but deny that Chelsea "was ever fighting officers or attempted to bite any officers." (Doc. 84 at ¶ 31).

An officer used a taser on Chelsea; Defendants assert that it was Officer Mackie, while Plaintiffs assert that it was Officer Argenta. (Doc. 71 at ¶ 31; Doc. 84 at ¶ 32).

When asked during her deposition whether neither she nor Chelsea was upset with the way Nicholas had been treated by the police on the night in question, Melinda Brower testified as follows: "We believe he was out of his mind." (Doc. 71 at ¶ 32; Doc. 84 at ¶ 33).

Immediately after testifying in his deposition about Nicholas being tasered, Nathan Brower testified as follows:

A: So then Chelsea was trying to – there was a female officer there.

Q: What was the female officer doing?

A: I believe she was – I just remember her grabbing Chelsea off Mindy. Because Mindy was holding her and Chelsea was biting her and she was just kicking her feet like trying to kick them. And then they put her – they were trying to, like, restrain Chelsea over the front of our car because our car was parked a little back further by the back. So they had her like trying to put her hands behind her back. It actually, like, scratched the fender of our car because she was, like, trying to, like, fight it. And then they tasered her and . . .

Q: Did you see which officer tasered –

18

A: I have no idea.

Q: Did you hear anything said before she was tasered?

A: No. That's all everybody was saying was put your hands behind your back. They just wanted people to calm down and everybody was, like, freaking out.

(Doc. 71, Ex. 9 at 21; *see also* Doc. 71 at ¶ 33; Doc. 84 at ¶ 34).

As to Nicholas's actions during the encounter with the police, Nathan Brower testified

as follows:

It was him screaming at the top of his lungs, them telling him to stop and relax. I don't know what he was on. He was freaking out. Like purple face screaming. And they were like please calm down. . . . He just wasn't listening. It didn't have to have any force. If he would have stopped screaming right when they arrived, then there would have been nothing that happened. They said, please stop, relax. He was like– just kept screaming the same thing. If he would have been like, okay, they probably would have been like, go home. I mean, I can't say what would have happened. But they let me go home and I was part of it. I stood there and did what they told me to do and walked in my house when it was done.

(Doc. 71 at ¶ 34; Doc. 84 at ¶ 35). Plaintiffs contest the veracity of Nathan Brower's

testimony on these points. (Doc. 84 at ¶ 35).

Nicholas Williams was charged with aggravated assault, simple assault, and

disorderly conduct and plead guilty to disorderly conduct under Section 5503(a)(1). (Doc.

71 at ¶ 35; Doc. 84 at ¶ 36).

Nicholas Williams testified that he received no medical treatment following the June

23, 2012 incident besides having taser prongs removed from his right flank and his back.

(Doc. 71 at ¶ 37; Doc. 84 at ¶ 38).

19

Nicholas Williams testified that he pled guilty to a charge of disorderly conduct for intending "to cause public inconvenience, annoyance, or alarm or recklessly creating a risk thereof, engaged in fighting or threatening or in violent or tumultuous behavior" by failing to obey police orders, pushing an officer, and fighting with officers while being taken into custody.  (Doc. 71 at ¶ 38; Doc. 84 at ¶ 39).

Christopher Taylor was also arrested.  (Doc. 71 at ¶ 41; Doc. 84 at ¶ 42).

Officer Argenta successfully completed the Municipal Police Officers Education & Training for Act 120 on February 5, 1999 from Lackawanna Junior College, where he underwent comprehensive municipal police officer training as indicated on the attached Police Academy Official Transcript for Act 120 Program training at Lackawanna Junior College.  (Doc. 71 at ¶ 42; Doc. 84 at ¶ 43).

In conjunction with his application for employment as a police officer with Olyphant Borough, Dean Argenta underwent a Criminal Record Check administered by the Pennsylvania State Police, dated August 21, 2011 with the result of "No Criminal Record." (Doc. 71 at ¶ 43; Doc. 84 at ¶ 44).

In connection with his application for employment as a police officer with Olyphant Borough, Dean Argenta underwent a Psychological Examination and verification of psychological fitness to serve as a police officer in Pennsylvania, dated September 8, 2011. (Doc. 71 at ¶ 44; Doc. 84 at ¶ 45).

Also as a part of his application for employment as a police officer with Olyphant

Borough, Dean Argenta underwent a Physical Examination and verification of physical

fitness to serve as a police officer in Pennsylvania, dated September 1, 2011. (Doc. 71 at ¶

45; Doc. 84 at ¶ 46).

Officer Argenta was convicted of indirect criminal contempt for violating a protection

from abuse order by placing a phone call to his ex-wife. (Doc. 71 at ¶ 46; Doc. 84 at ¶ 47).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). Once such a showing has been made, the non-moving party must offer specific

facts contradicting those averred by the movant to establish a genuine issue of material fact.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party

may not oppose summary judgment simply on the basis of the pleadings, or on conclusory

statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a

fact cannot be or is genuinely disputed must support the assertion by citing to particular

parts of materials in the record . . . or showing that the materials cited do not establish the

21

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

### A. The Borough of Olyphant

In the Third Amended Complaint, Chelsea Williams and Nicholas Williams raise

identical claims of *Monell* liability against the Borough of Olyphant (Counts VII and Count

VIII, respectively). (Doc. 96 at ¶¶ 131-138). Each claim proceeds on two different theories:

1) that the Borough of Olyphant failed to train its officers in regard to the use of excessive

force and 2) that the Borough of Olyphant does not adequately screen its officer. (*Id*. at ¶¶

132, 136).

#### 1. Municipal Liability – Failure to Train

The Court will begin with the Plaintiffs' failure to train theory of municipal liability.

The United States Supreme Court has held that "under certain circumstances" a

municipality can be liable under "§ 1983 for constitutional violations resulting from its failure

to train municipal employees." *City of Canton v. Harris*, 489 U.S. 378, 380 (1989). "A

municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns

on a failure to train," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), and thus "rigorous

standards of culpability and causation must be applied to ensure that the municipality is not

held liable solely for the actions of its employee." *Bd. of Cnty Com'rs of Bryan Cnty v.*

*Brown*, 520 U.S. 397, 405 (1997). Thus, any such failure to train "must amount to

'deliberate indifference to the rights of persons with whom the [untrained employees] come

into contact'" in order to "'be properly thought of as a city 'policy or custom' that is actionable

23

under § 1983.'" *Connick*, 563 U.S. at 61 (quoting *City of Canton*, 489 U.S. at 388-89).

However, "[w]ithout notice that a course of training is deficient in a particular respect,

decisionmakers can hardly be said to have deliberately chosen a training program that will

cause violations of constitutional rights." *Id.* at 62. "Actual or constructive notice that a

particular omission in their training program causes city employees to violate citizens'

constitution rights" is required in order to deem a municipality deliberately indifferent. *Id.* at

61. As such, "[a] pattern of similar constitutional violations by untrained employees is

'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."

*Id.* at 62.

It is unclear from the Plaintiffs' briefing whether they have abandoned their theory of

municipal liability based on failure to train. In their Third Amended Complaint, the Plaintiffs

allege that

> [u]pon information and belief, Defendant Borough does not train its police
> officers at all and instead simply utilizes the Chief of Police of the Police
> Department without assuring that the Department uses its police powers
> appropriately and constitutionally and provide adequate training and oversight
> to its police officers.

(Doc. 95 at ¶¶ 133, 137). However, Plaintiffs do not expand upon or otherwise support this

allegation in their response to the Olyphant Defendants' Motion for Summary Judgment. In

the Plaintiffs' Counter-Statement of Material Facts (Doc. 84), the only assertion of the fact

that the Court can divine as addressing Plaintiffs' failure to train theory is as follows:

24

Chief Gillgalon, of the Olyphant Police Department, testified that the Olyphant Police Department did have a Policy and Procedure Manual which specifically dealt with the Use of Force.

(Doc. 84 at ¶ 124). In their Brief in Opposition to the Olyphant Defendants' Motion for

Summary Judgment (Doc. 83), the Plaintiffs do discuss the state of the law of municipal

liability under § 1983 with respect to failure to train, noting, *inter alia*, that the allegedly

deficient training must be "closely related to the ultimate injury." (Doc. 83 at 8). Plaintiffs

then go on to ask the Court "to take judicial notice of the number of civil rights law suits that

have been filed against the Borough of Olyphant in this Court," (*id.* at 9), but they neither

direct the Court to specific cases nor mention upon what type of alleged civil rights

violations they are based. Plaintiffs then state:

In the instant matter, the Borough of Olyphant's conscious disregard for the constitutional obligation that it owes to its citizenry is clear and obvious. . . . [E]vidence of a single violation of federal rights, in concert with a showing that a municipality has failed to train its employees to handle recurring situations could trigger municipal liability.

(Doc. 83 at 9-10). In the Court's view, however, it is anything but clear and obvious how the

Borough of Olyphant failed to train its employees. To the extent the Plaintiffs claim that the

Borough of Olyphant failed to train its police officers on the use of force, as the Third

Amended Complaint suggests, Plaintiffs have not pointed the Court to any record evidence

that would create a dispute of material fact as to whether the Borough's policy was deficient,

whether the Borough had notice of that deficiency, or whether the Borough was then

deliberately indifferent to the rights of individuals with whom its untrained police officers

came into contact. To the extent that the Plaintiffs may be claiming that the Borough of Olyphant failed to train its police officers with regard to screening job applicants, there is simply no basis for this assertion in the Third Amended Complaint or in the cited-to evidence of record. And to the extent that Plaintiffs' discussion of failure to train case law, sandwiched as it is in between sections of their Brief discussing inadequate screening, is an attempt to bolster their claim of municipal liability under a theory of single-incident inadequate screening with respect to Defendant Argenta, the inclusion of this discussion is unnecessary to prove that the Borough failed to adequately screen Defendant Argenta. In any case, Plaintiffs may not proceed with their *Monell* claim against the Borough of Olyphant on a theory the Borough failed to adequately train its police officers.

### 2. Municipal Liability – Inadequate Screening

Plaintiffs' second theory is that the Borough of Olyphant failed to adequately screen Defendant Argenta upon his hire. In support of this theory, Plaintiffs assert that Argenta had been convicted of violating a Protection from Abuse Order prior to beginning his employment with Olyphant, a claim for which there is supporting evidence of record. (*See* Doc. 82, Ex. 3 at 8). They further assert that Olyphant was made aware of this conviction at the time it hired Argenta through the efforts of a Borough council member. (*See* Mitcho Deposition, Doc. 82, Ex. 9 at 10-12). It follows, then – according to Plaintiffs – that this conviction is "clear and concise evidence of [Argenta's] failure to adhere to the law and predictable of his relationship with women and supports Plaintiffs' *Monell* claim," (Pl.'s Brief

26

in Opposition, Doc. 83 at 11), such that "Argenta lacked the fitness to serve as a law enforcement officer," (*id.* at 10). The Plaintiffs argue that "[i]t is a natural consequence and easy to predict what might flow from this decision and that is exactly what occurred here when Argenta encountered the Plaintiffs on June 23, 2012." (*Id.*).

Seemingly to bolster this line of argument, the Plaintiffs have also put into the record evidence that Argenta wrongly concealed this conviction on his "Application for Police Officer Certification" from the Municipal Police Officers' Education and Training Commission ("MPOETC"). (*See* Doc. 82, Ex. 5 at 2-3; Ex. 3 at 6, 8). In Pennsylvania, "[t]o work as a municipal police officer[,] an individual must obtain certification from [MPOETC] by meeting certain qualifications and completing training." *Speck v. City of Phila.*, No. CIV.A. 06-4976, 2007 WL 2221423, at *1 (E.D. Pa. July 31, 2007). Via a Police Criminal Complaint and accompanying Affidavit of Probable Cause filed by Detective Lisa Bauer and approved by District Attorney Andrew Jarbola on August 16, 2012, Argenta was accused of the crime of "Unsworn Falsification to Authorities." (Doc. 82, Ex. 3 at 5-9). This charge stemmed from Argenta's allegedly having

> [a]nswered "No" to the question "Have you ever been arrested or charged with a violation of the law? " in box #19 on his Application for Certification Under the Municipal Police officers' Education and Training Program or Waiver of Training, and then [having] sign the certification at the bottom of the application, when in fact he was charged on 09/19/2000 with a Violation of a Protection from Abuse Order, and then he entered a plea of guilty to that charge on 09/27/2000 . . . .

27

(*Id.* at 6). The Affidavit of Probable Cause states that Argenta filled out the MPOETC application on August 29, 2011. (*Id.* at 8). According to the signed declaration of Michael R. Goffer, who represents that he was the Assistant District Attorney assigned to Argenta's falsification case, "the District Attorney's Office reached an agreement with Mr. Argenta that the criminal charge would be withdrawn upon his agreement that he would never serve as a police officer in the Commonwealth of Pennsylvania." (Doc. 82, Ex. 4).

Plaintiffs have also put into evidence an August 13, 2012 letter from Major Joseph Elias, Executive Director of MPOETC at the time, to Defendant Argenta, informing him that MPOETC "intends to revoke [his] police officer certification for cause," as a result of Defendant Argenta violating applicable rules and regulations in that he (1) "failed to report information to [MPOETC] when completing the Application for Police Officer Certification as a waiver of training applicant through the Olyphant Borough Police Department in August 2011;" and (2) "signed the Application for Police Officer Certification certifying to the completeness and truthfulness of information contained on the application." (Doc. 82, Ex. 5 at 2). According to the letter, this conduct allowed MPOETC to revoke his certification on the following ground: "[s]ubmission to the Commission of a document that the police officer knows contains false information including fraudulent application." (*Id.*; *see also* 37 Pa. Code § 203.14(a)(7)).

From these facts about Major Elias's letter to Argenta, Plaintiffs assert that "this information" – MPOETC's grounds for pursuing revocation of Defendant Argenta's

certification – "is the exact information which the Borough of Olyphant Council was aware of prior to the hiring of Argenta." (Doc. 83 at 5). According to Plaintiffs, "the Borough of Olyphant was well aware that Mr. Argenta was unfit to serve as a police officer in the Borough of Olyphant as his conviction for violation of a Protection from Abuse Order prohibited Argenta from serving as a police officer in this Commonwealth." (Id. at 6). The record, however, does not support these inferences and assertions by Plaintiffs. Major Elias's letter is silent as to whether the conviction itself was a bar to certification and instead announces MPOETC's intent to seek revocation of Argenta's certification based on his omission of this conviction from his signed application. And there is no clear indication in the record that the Borough was aware of Defendant Argenta's failure to disclose this conviction to MPOETC.

In addressing this theory of liability, the Court is constrained by the United States Supreme Court's clear holdings in *Board of County Commissioners v. Brown*, 520 U.S. 397, 411 (1997), a case relied on heavily by the Olyphant Defendants, (*see* Doc. 72 at 13-16). Building on the seminal failure to train case *Canton v. Harris*, the Court in *Brown* recognize that, in order to establish *Monell* liability on a theory of inadequate screening "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifferent to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. Deliberate indifference is a "stringent standard of fault," *id.* at 410, and thus

> [o]nly where adequate scrutiny of an applicant's background would lead a
> reasonable policymaker to conclude that the plainly obvious consequence of

the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'

*Id*. at 411. Furthermore, "the connection between the background of the particular applicant and the specific constitutional violation alleged must be strong;" that is, a finding of culpability "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id*. at 412. "Courts that have addressed *Brown* have consistently interpreted it to mean that municipal liability for negligent hiring based on a single hiring decision requires the threat identified in an applicant's background to be basically identical to the harm eventually caused by the applicant." *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 426-27 (M.D. Pa. 2014) (Kane, J.) (collecting cases).

The Court notes that there are factual disputes about whether or not the Borough was aware of Defendant Argenta's prior conviction. However, these disputes are not material here, because even assuming the Plaintiffs' version of facts – that is, drawing all reasonable inferences from the record in favor of the Plaintiffs, the non-moving parties – the Plaintiffs cannot establish that the Borough failed to adequately screen Defendant Argenta. Thus, the Borough is entitled to judgment in their favor as a matter of law. Whether Plaintiffs' argument is that Defendant Argenta should not have been hired because of his prior conviction – the argument most supported by their briefing and the state of the record –, that he should not have been hired because he omitted this conviction on his MPOETC

certification application, or that he should not have been hired because of both the conviction and the omission, Plaintiffs cannot establish that Defendant Argenta's alleged use of excessive force against the Plaintiffs was the "plainly obvious consequence" of the decision to hire him.

First, it is undisputed that Defendant Argenta's prior conviction was for indirect criminal contempt for violating a protection from abuse order by placing a phone call to his ex-wife, (see supra, Part II), a conviction that involved no use of force and whose victim was someone well known to him. The records placed into evidence by the Plaintiffs indicated that this conviction dated back to 2000. Second, Argenta's alleged actions in omitting this conviction from his MPOETC application in 2011 and in then signing said document, while dishonest and possibly criminal, as evidenced by the falsification charge that was subsequently made against him, are nonviolent and not of the same type as the conduct alleged by Plaintiffs. The Borough's decision to hire Argenta despite the conviction and/or the omission of that conviction on the MPOETC application is not sufficiently causally related to Plaintiffs' excessive force claim. A jury could not reasonably find that Defendant Argenta was "highly likely" to use excessive force based on these incidents. Thus, the Borough of Olyphant is entitled to summary judgment in its favor on Plaintiffs' failure to screen claim.

31

### 3. Intentional Infliction of Emotional Distress

Count X of Plaintiffs' Third Amended Complaint is titled "Chelsea Williams v.

Defendants" "Intentional Infliction of Emotional Distress." (Doc. 95 at 35). In an Order (Doc.

48) adopting Magistrate Judge Carlson's Report and Recommendation (Doc. 46) on the

Olyphant Defendants' Motion to Dismiss (Doc. 17), the Court ordered that Count XV of the

Plaintiffs' earlier Amended Complaint (Doc. 10) be dismissed as to the Borough of Olyphant

and allowed to proceed against all individual Defendants. Count XV of the Plaintiffs'

Amended Complaint (Doc. 10) was also titled "Chelsea Williams v. Defendants" "Intentional

Infliction of Emotional Distress." (Doc. 10 at 36). The Court adopted the Report and

Recommendation recommending dismissal of this claim against Olyphant because "under

state law . . . [municipal] defendants are immune from liability for intentional torts committed

by their employees." (Doc. 46 at 25; see also 42 Pa. C.S.A. § 8542(a)). Thus, to the extent

that Count X of Plaintiffs' Third Amended Complaint continues to allege that the Borough of

Olyphant committed the tort of intentional infliction of emotional distress against Chelsea

Williams, the Court has previously found this claim barred and Plaintiffs' may not continue to

pursue it. Thus, the Olyphant Defendants' Motion for Summary Judgment is denied as

moot with respect to Count X of the Third Amended Complaint.

### 4. Loss of Consortium

Count XIII of the Third Amended Complaint alleges loss of consortium on behalf of

Chelsea Williams against all Defendants. (Doc. 95 at 38). Count XIV alleges loss of

consortium on behalf of Nicholas Williams against all Defendants. (Id. at 39). Because the

Borough of Olyphant cannot be held liable for any of the state law claims alleged by

Plaintiffs in the Third Amended Complaint, either because the Third Amended Complaint

does not make those allegations against the Borough of Olyphant or because such

allegations are improper, (see supra, Part IV(A)(3)), the Plaintiffs cannot recover from the

Borough for loss of consortium. "In Pennsylvania, an action for loss of consortium is

'derivative, depending for its viability upon the substantive merit of the injured party's

claims.'" Bean v. Ridley Twp., No. CIV.A. 14-5874, 2015 WL 568640, at *14 (E.D. Pa. Feb.

10, 2015) (quoting Schroeder v. Ear, Nose & Throat Assocs. of Lehigh Valley, Inc., 557

A.2d 21, 22 (Pa. Super. Ct. 1989)). Because there are no remaining state law claims

against the Borough, there are no viable claims upon which a derivative claim for loss of

consortium may be based. The Court will grant summary judgment in favor of the Borough

of Olyphant with respect to Counts XIII and XIV.

## B. Defendant Argenta

### 1. Excessive Force and Unlawful Seizure § 1983 Claims

Count I of the Third Amended Complaint alleges that Defendant Argenta violated

Chelsea Williams's "[c]onstitutional rights to be free from unreasonable and unlawful

seizures and free from the use of excessive force." (Doc. 95 at 26). Count II alleges that

Defendant Argenta violated Nicholas Williams's "[c]onstitutional rights to be free from

unreasonable and unlawful seizures and free from the use of excessive force." (Id. at 26-

27). Claims that police officers used excessive force against a plaintiff, as in the instant

case, are properly treated as falling under the Fourth Amendment's prohibition on

unreasonable seizures. *See Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004)

("The Supreme Court has held that all claims of excessive force by police officers, in the

context of an arrest, investigatory stop, or other 'seizure,' should be analyzed under the

Fourth Amendment."). Thus, the Plaintiffs' claims for violations of their "[c]onstitutional

rights to be free from unreasonable and unlawful seizures and free from the use of

excessive force" amount to claims that their respective Fourth Amendment rights were

violated.

   The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."

U.S. Const. amend. IV. The Fourteenth Amendment extends the Fourth Amendment's

prohibition against unreasonable searches and seizures to state officers. *Elkins v. United

States*, 364 U.S. 206, 213 (1960). "To state a claim for excessive force as an unreasonable

seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and

that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing

*Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)). "A seizure occurs for Fourth

Amendment purposes when 'a reasonable person would have believed that he was not free

to leave.'" *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 147 (3d Cir.2005) (quoting

*Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). Courts take "a broad approach in

considering what constitutes a seizure," *Gallo v. City of Philadelphia,* 161 F.3d 217, 224 (3d Cir. 1998), and consider the totality of "all of the circumstances surrounding the incident." *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). Because of the importance of the surrounding circumstances, the Third Circuit has held that "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas,* 365 F.3d at 198. The absence of physical injury or contact does not necessarily mean that excessive force was not used. *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir. 1997).

Here, there can be no doubt that a seizure of each Plaintiff occurred, as both were arrested. The question is, then, whether those seizures and the force used in effecting them were reasonable under the circumstances. As discussed above, there are significant and numerous factual disputes between the parties as to what occurred on the night of June 23, 2012. The nature and size of the fight between Nicholas Williams and Nathan Brower that occurred outside of the Brower house is disputed. Whether Defendant Argenta used his taser against either Plaintiff is disputed. Whether Nicholas shoved Defendant Argenta as Defendant Argenta was attempting to take him into custody is disputed. Whether Officer Mackie was involved in the arrest of Nicholas is disputed. Nicholas's demeanor throughout these events is disputed. Whether Chelsea Williams was attempting to kick the officers arresting her husband is disputed. Whether she jumped on Defendant Argenta's back and began to scratch at his eyes is disputed. In short, Defendant Argenta would have the Court believe that the Plaintiffs were aggressive and out-of-control, resisting arrest, and posing a

threat to officer safety, while Plaintiffs deny these assertions and would have the Court believe that Defendant Argenta violently disrupted their wedding night without provocation. The parties have shaped their summary judgment materials to reflect these inconsistent theories. And so, after reviewing the record and the parties' briefing, the Court cannot say what occurred on the night of June 23, 2012; there are simply too many disputes of material fact. And, since the Court does not know what Defendant Argenta's role in these events was, it follows that it also cannot determine whether his actions were reasonable under the Fourth Amendment.

The Defendants next argue that even if Defendant Argenta violated one or both of the Plaintiffs' constitutional rights, he is "shielded" by qualified immunity. (Doc. 72 at 22). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity serves the dual purpose of holding government officials accountable when their power is exercised unreasonably and protecting those officials from "harassment, distraction, and liability when they perform their duties reasonably." *See id.* "Qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2003) (Kennedy, J. dissenting)). Qualified

immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted).

"Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (qualified immunity may turn on disputed issues of fact); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995) ("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination."). The same factual uncertainties that prevent the Court from deciding, as a matter of law, that the arrests of Plaintiffs and the force used by Defendant Argenta in effecting them were reasonable also prevent the Court from finding that Defendant Argenta is entitled to qualified immunity. The Court does not know what occurred on the night of June 23, 2012, and, therefore, cannot say that if Defendant Argenta violated one or both Plaintiffs' constitutional rights, that mistake was reasonable. Defendant Argenta is not entitled to summary judgment on the excessive force claim of either Plaintiff.

## 2. State Law Tort Claims

### a. Abuse of Process and Malicious Prosecution

As discussed at the onset of this Memorandum, at the time the Olyphant Defendants filed their Motion for Summary Judgment (Doc. 70), their Motion to Dismiss Count IX of the

Second Amended Complaint (Doc. 54) remained pending. Count IX of the Second

Amended Complaint was a claim for the tort of abuse of process. The Court subsequently

dismissed Count IX of the Second Amended Complaint with leave to amend to allege a

claim for malicious prosecution with respect to Defendant Argenta. (See Doc. 94). Plaintiffs

then submitted a Third Amended Complaint (Doc. 95). Count IX of the Third Amended

Complaint brings a claim of malicious prosecution against Defendant Argenta. (Doc. 95 at

33). Thus, the Olyphant Defendants' Motion for Summary Judgment with respect to Count

IX of the Second Amended Complaint – a claim for abuse of process – will be denied as

moot.

In Count IX of the Third Amended Complaint, Chelsea Williams raises a claim for

malicious prosecution against Defendant Argenta under Pennsylvania state law. The

Olyphant Defendants have not moved for summary judgment on Count IX.

### b. Intentional Infliction of Emotional Distress

In Count X of the Third Amended Complaint, Chelsea Williams raises a claim for

intentional infliction of emotional distress ("IIED") against Defendant Argenta. In order to

prove a claim for IIED, a plaintiff must show that the defendant acted with "intentional

outrageous or extreme conduct" which caused her severe emotional distress. Swisher v.

Pitz, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005). "Outrageous or extreme conduct has

been defined by the appellate courts of this Commonwealth as conduct that is so

outrageous in character, so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Id.*

(internal quotation marks omitted). That is,

> it has not been enough that the defendant has acted with intent which is
> tortious or even criminal, or that he has intended to inflict emotional distress,
> or even that his conduct has been characterized by "malice," or a degree of
> aggravation that would entitle the plaintiff to punitive damages for another tort.

*Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (internal citations and quotation marks

omitted). "With regard to the element of outrageousness, it is for the court to determine in

the first instance whether the defendant's conduct may reasonably be regarded as so

extreme and outrageous to permit recovery." *Swisher*, 868 A.2d at 1231.

> Cases which have found a sufficient basis for a cause of action of intentional
> infliction of emotional distress have . . . presented only the most egregious
> conduct. *See[,] e.g.*, *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970)
> (defendant, after striking and killing plaintiff's son with automobile, and after
> failing to notify authorities or seek medical assistance, buried body in a field
> where discovered two months later and returned to parents (recognizing but
> not adopting section 46)); *Banyas v. Lower Bucks Hospital*, 437 A.2d 1236
> (Pa. Super. Ct. 1981) (defendants intentionally fabricated records to suggest
> that plaintiff had killed a third party which led to plaintiff being indicted for
> homicide); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir.
> 1979) (defendant's team physician released to press information that plaintiff
> was suffering from fatal disease, when physician knew such information was
> false).

*Hoy*, 720 A.2d at 754.

"In addition to these substantive requirements, Pennsylvania courts have also

established an evidentiary requirement for relief: the 'existence of the alleged emotional

distress must be supported by competent medical evidence.'" *Martin v. City of Reading*,

118 F. Supp. 3d 751, 768-69 (E.D. Pa. 2015) (quoting *Kazatsky v. King David Mem'l Park, Inc.,* 527 A.2d 988, 995 (1987)); *see also DeBellis v. Kulp,* 166 F. Supp. 2d 255, 281 (E.D. Pa. 2001) ("To recover for intentional infliction of emotional distress in Pennsylvania, a plaintiff must support the claim of emotional distress with competent medical evidence, in the form of expert medical evidence.") (citing *Hackney v. Woodring,* 539 Pa. 266, 652 A.2d 291, 292 (1994) (per curium)). While it is not necessary that plaintiffs making IIED claims seek treatment for their emotional injuries, they must support the existence and nature of those injuries with competent medical evidence. *Rosen v. Am. Bank of Rolla,* 3 Pa. D. & C.4th 88, 91 (Com. Pl. 1989), *aff'd,* 627 A.2d 190 (1993) ("[P]laintiffs who allege intentional infliction of emotional distress simply must provide competent medical testimony generally supportive of the symptoms, severity, causation, or incidence of the alleged emotional injury in order to sustain their claims.").

While the factual issues in dispute would make it difficult to determine whether or not Defendant Argenta's conduct on the night of June 23, 2012 could be characterized as extreme or outrageous, Chelsea has failed to meet her evidentiary burden with respect to this claim and, thus, the Court will grant summary judgment to Defendant Argenta. In opposition to Defendant Argenta's request for summary judgment on the IIED claim, Plaintiffs have directed the Court to testimonial evidence in the record which indicates that Chelsea Williams sought medical care for a miscarriage two days after the incident, (*see* Doc. 83 at 29), which the Court will reproduce here:

40

Q: Other than the EMTS checking you out did you get any follow-up medical care for any injuries or problems you believe were caused by this incident?

A: Yes.

Q: What is that?

A: It was, I want to say, two days after the incident – after the wedding night I had abnormal bleeding. It [sic] was brought to the hospital with my mom and it was a miscarriage.

Q: Did you have any prior pregnancies that resulted in miscarriage also?

A: No.

Q: None?

A: No.

Q: Did any doctor tell you that he believes that [t]he occurrences of that evening caused your miscarriage?

A: No.

Q: Other than that treatment, any other treatment that you think you received after this incident that was caused by the incident?

A: No.

(Doc. 80, Ex. 1 at 48-49). This testimony itself does not constitute competent medical

evidence that this plaintiff suffered emotional distress as a result of the events of June 23,

2012. Plaintiffs have not pointed the Court to medical records from this hospital visit, nor

have they adduced expert opinion evidence on the subject. And by her own testimony,

Chelsea Williams received no other treatment related to the events of June 23, 2012, which

indicates to the Court that there is no medical evidence supporting her IIED claim in the

41

record. Furthermore, it is unclear from this testimony itself whether her visit to the hospital was indeed causally connected to that incident. Defendant Argenta is thus entitled to summary judgment on Chelsea Williams's IIED claim. *See, e.g.*, *DeBellis*, 166 F. Supp. 2d at 281 ("Because plaintiffs have not offered any medical evidence to support their [IIED] claim, we grant summary judgment on this claim in favor of Officers Bennis, Kulp, Morris and Moyer."); *Martin*, 118 F. Supp. 3d at 768-69 (E.D. Pa. 2015) ("Unsubstantiated allegations do not amount to competent medical evidence, and Plaintiff's failure to direct the Court to any such evidence to support those allegations is fatal to his claim."); *Paith v. Cty. of Washington*, 394 F. App'x 858, 861 (3d Cir. 2010) (holding that the district court did not err in granting summary judgment in favor of defendant where plaintiff "did not adduce any medical evidence in support of her claim.").

### c. *Assault and Battery*

In Count XI of the Third Amended Complaint, Chelsea Williams raises a claim for "assault and battery" against Defendant Argenta under Pennsylvania state law. In Count XII, Nicholas Williams also raises a claim for "assault and battery" against Defendant Argenta. As Plaintiffs recognize, (*see* Doc. 83 at 30), Counts XI and XII each contain within them two separate tort theories. To state a claim for assault, Pennsylvania law requires a showing of "an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Cucinotti v. Ortmann,* 159 A.2d 216, 217 (Pa. 1960); *see also* Restatement (Second) of

Torts § 21(1) (1965). "[T]he actor must be in a position to carry out the threat immediately, and he must take some affirmative action to do so." *Id.* To establish a claim of battery, a person must act intending to cause a harmful or offensive contact with another person, or an imminent apprehension of such contact, and an offensive contact with the person is the direct or indirect result. *Herr v. Booten,* 580 A.2d 1115, 1117 (Pa. Super. Ct. 1990); Restatement (Second) of Torts § 18(1) (1965). A plaintiff is not required to show actual physical injury to establish a battery, only an unpermitted and therefore "offensive" contact. *Montgomery v. Bazaz–Sehgal,* 742 A.2d 1125, 1131 (Pa. Super. Ct. 1999), *aff'd,* 798 A.2d 742 (Pa. 2002). The Olyphant Defendants rely on the following propositions of law from *Renk v. City of Pittsburgh,* 641 A.2d 289 (1994), to argue that Defendant Argenta is entitled to summary judgment with respect to these counts:

> A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest. The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery.

*Id.* at 293; (Doc. 72 at 27). Because disputes of material fact prevent the Court from judging the reasonableness of Defendant Argenta's actions with respect to Chelsea and Nicholas Williams, *see supra* Part IV(B)(1), the Court is also prevented from determining whether his conduct constitutes an assault and battery. The Court will deny Defendant Argenta's Motion for Summary Judgment with respect to Counts XI and XII.

43

### d. Loss of Consortium

The Olyphant Defendants argue that Chelsea and Nicholas Williams's claims against Defendant Argenta for loss of consortium do not lie because loss of consortium is a derivative claim and the other state law claims made against Defendant Argenta are "invalid." (Doc. 72 at 28). Because Chelsea and Nicholas Williams's state law claims for assault and battery are allowed to proceed, the Court will not grant summary judgment on this basis with respect to the loss of consortium claims.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Olyphant Defendants' Motion for Summary Judgment (Doc. 70). A separate Order follows.

Robert D. Mariani
United States District Judge

44