IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHELSEA WILLIAMS and       :
NICHOLAS WILLIAMS,         :
                                  :
         **Plaintiffs,**     :
   **v.**                 :   **3:13-CV-02945**
                                  :   **(JUDGE MARIANI)**
**JOHN GILGALLON, et al.,**    :
                                  :
        **Defendants.**   :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On December 9, 2013, Plaintiffs Chelsea Williams and Nicholas J. Williams filed a

Complaint against Defendants John Gilgallon, Dean Argenta, and the Borough of Olyphant

("Olyphant Defendants"). (Doc. 1). Plaintiffs filed an Amended Complaint on March 14,

2014 against the Olyphant Defendants, also adding as defendants Officer Katie Fallon,

Officer Mackey, and the Borough of Dickson City ("Dickson City Defendants"). (Doc. 10).

Upon consideration of a Motion to Dismiss the Amended Complaint filed by the Olyphant

Defendants (Doc. 17), a Motion to Dismiss the Amended Complaint filed by Dickson City

(Doc. 29), and related briefs, United States Magistrate Judge Carlson issued a Report and

Recommendation on February 24, 2015 (Doc. 46). The Court adopted the Report and

Recommendation by way of Order dated March 30, 2015 and, in relevant part, dismissed all

counts against the Borough of Dickson City. (See Doc. 48 at ¶ 3). Plaintiffs filed a Second

Amended Complaint on April 13, 2015 (Doc. 49). On April 29, 2015, the Olyphant

Defendants[1] filed a Motion to Dismiss Count IX of the Second Amended Complaint (Doc.

54). By way of a Memorandum (Doc. 93) and Order (Doc. 94) dated February 12, 2016, the

Court granted the Olyphant Defendants' Motion, dismissing Count IX with prejudice as to

the Borough of Olyphant and dismissing it without prejudice and with leave to instead allege

a claim for malicious prosecution as to Defendant Argenta. On February 19, 2016, Plaintiffs

filed a Third Amended Complaint (Doc. 95), in which Count IX is now a claim for malicious

prosecution against Defendant Argenta.

After the Olyphant Defendants filed their Motion to Dismiss Count IX of the Second

Amended Complaint (Doc. 54), but before the Court ruled on it, the Dickson City Defendants

filed a Motion for Summary Judgment (Doc. 73), which is presently pending before the

Court. In the Motion, the Dickson City Defendants move for summary judgment on all

claims against them that were advanced by Plaintiffs in the Second Amended Complaint.

Though this Motion for Summary Judgement (Doc. 73) was filed while the Second Amended

Complaint was the operative complaint in this case, and though the Second Amended

Complaint has since been superseded by the Third Amended Complaint, the claims against

the Dickson City Defendants were not altered by the amendment, nor have these

Defendants notified the Court that they wish to refile their Motion for Summary Judgment

and related briefing in light of the most recent pleading. Additionally, the dispositive motion

---

[1] By way of previous Order, this Court dismissed Defendant John Gilgallon from the action. (Doc.
48 at 1). As such, the remaining Olyphant Defendants are Dean Argenta and the Borough of Olyphant.

deadline has long since expired. (See Case Management Order, Doc. 67). Thus, the Court will consider the Motion for Summary Judgement (Doc. 73) to be seeking judgment in the Dickson City Defendants' favor on all claims against them in the Third Amended Complaint.

The Dickson Defendants' Motion for Summary Judgment (Doc. 73) has been fully briefed and is ripe for decision. For the reasons set forth below, the Court will deny in part and grant in part the Dickson City Defendants' Motion for Summary Judgement (Doc. 73).

## II. FACTUAL BACKGROUND

In their submission entitled "Statement of Material Facts in Support of the Motion for Summary Judgment of Defendants Fallon and Mackie" (Doc. 74), the Dickson City Defendants notified the Court that they have chosen to "incorporate by reference . . . paragraphs 1-41 of Codefendants Argenta and Olyphant Borough's Statement of Material Facts," which can be found docketed at Document 70, rather than submit their own statement of material facts. Because the Dickson City Defendants have chosen to adopt Paragraphs 1 – 41 of the Olyphant Defendants' Statement of Material Facts, the material facts at issue are those outlined in the Court's Memorandum Opinion (Doc. 97) denying in part and granting in part the Olyphant Defendants' Motion for Summary Judgment. For ease of reference, we restate them below.[2]

---

[2] By adopting the Olyphant Defendants' Statement of Material Facts, the Dickson City Defendants also avail themselves of this Court's criticisms of that document. (See Memorandum Opinion, Doc. 97, Part II). Indeed, the Court is disconcerted by the choice of Counsel for the Dickson City Defendants to rely on such an obviously flawed document, particularly where that document is focused on the actions of Defendant Argenta – an Olyphant Defendant – and contains assertions of facts inconsistent with the testimony of their own client. Asserting in the Brief in Support that Officer Mackie "was not actively

3

Except where expressly noted as disputed, the following facts of record are undisputed.

Plaintiffs Chelsea and Nicholas Williams (hereinafter "Chelsea" and "Nicholas," respectively) were married on June 23, 2012 and then proceeded to a reception at the Montdale Country Club. (Defendants' SMF, Doc. 71 at ¶ 1; Plaintiffs' Response, Doc. 84 at ¶ 1). Nicholas drank alcohol on the day of his wedding. (*Id.* at ¶ 2).[3] The Olyphant Defendants cite to the deposition testimony of various guests, including Angella Grunza and Nathan Brower, for the assertions that Nicholas was very intoxicated, loud, aggressive, vulgar, touchy-feely, obnoxious, slurring his speech, acting outrageously, and asking for cocaine, (Doc. 71 at ¶ 2), though the Plaintiffs point to other portions of deposition testimony

---

engaged with the attempts to control and subdue Nicholas Williams," (Doc. 77 at 4), does not undo Counsel's choice to adopt the Olyphant Defendants' assertion that Officer Mackie helped Defendant Argenta take Nicholas Williams into custody, nor does it deflect from Counsel for the Dickson City Defendants and the Dickson City Defendants themselves the consequences of asserting as "fact" a statement the claimed undisputed nature of which is so thoroughly belied by the record.

³ With respect to SMF ¶ 2 and numerous other assertions of fact, Plaintiffs begin their response with the following: "Objection pursuant to Rule 56 (c)(2) of the Federal Rules of civil Procedure. This answer is provided without waiver of said objection." (Doc. 84 at ¶ 2). Rule 56 (c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." For their repeated Rule 56 (c)(2) objections, Plaintiffs do not specify on what grounds they believe the Olyphant Defendants' cited materials are inadmissible or often what particular portions of that cited material they believe is inadmissible. The Court will not review each and every statement of fact objected to for all possible grounds upon which they may be inadmissible when Plaintiffs themselves have not attempted to support their objections. Furthermore, the Court is not in a position to review the admissibility of this evidence at trial. For instance, to the extent Plaintiffs are raising hearsay objections to the materials cited, the Olyphant Defendants may be able to produce these declarants at trial. *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995*)* ("[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial.") (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Company*, 998 F.2d 1224, 1234 n.9 (3d Cir.1993)).

4

to undercut these accounts of Nicholas's behavior, such as Angella Grunza's testimony that she "wasn't really around [Nicholas] too much," (Doc. 84 at ¶ 2).

The reception ended and Chelsea travelled to Melinda Brower's home, while Nicholas travelled in a separate car. (Doc. 71 at ¶ 3; Doc. 84 at ¶ 3). Katie Grunza was driving the car that Nicholas was in, with Nicholas seated in the front passenger seat with Angella Grunza, Chelsea's sister, seated on his lap; the rest of the occupants were in the back seat. (Id. at ¶ 4). Angella Grunza testified at her deposition that Nicholas tried to inappropriately touch her several times in the car and that she repeatedly tried to push him away. (Id. at ¶ 6).[4] The car that Nicholas was riding in was stopped by Olyphant Police Officer Michael Crowley approximately one block from the Browers' home because it had too many occupants. (Id. at ¶ 5). Officer Crowley told the occupants they would have to travel home with a safe number of occupants in the vehicle. (Id. at ¶ 7). Officer Crowley testified at his deposition that at the time of the traffic stop, Nicholas "had glassy, bloodshot eyes" and the odor of alcohol emanating from his person. (Doc. 71 at ¶ 7; Doc. 84 at ¶ 7).

---

[4] Plaintiffs admit SMF ¶ 6 in part and deny it in part. (Doc. 84 at ¶ 6). The Court has reviewed Plaintiffs' response, the deposition transcript cited by the Olyphant Defendants, (Doc. 71, Ex. 7 at 19-22), and the overlapping section cited by Plaintiffs (Doc. 80, Ex. 3 at 19-21), and has noted here only the portions of SMF ¶ 6 as to which there is no genuine dispute. The Court notes that this is an example of a factual assertion where the Olyphant Defendants could have greatly aided the Court's direct and accurate consideration of their Motion but failed to do so. Simply by framing SMF ¶ 6 in terms of Angella Grunza's testimony would have greatly aided the Court's ability to expeditiously and accurately review of the proposed facts in SMF ¶ 6 and Plaintiffs' responses thereto. This issue occurs throughout the SMF. Thus, where necessary to accurately reflect what fact is undisputed by the parties, the Court has reframed statements of material fact in terms of to what various individuals *testified*.

During the stop, Nicholas said, "fuck all of you," (*id*.),[5] which Officer Crowley testified was
directed to the passengers inside the vehicle, (Doc. 71, Ex. 13 at 38, lines 16-19).

After arriving at the home of the Browers, Chelsea waited in her car with the children
until Nicholas arrived; it is unclear if Nicholas traveled there in the car with Katie Grunza or if
he walked from the traffic stop to the home of the Browers. (*Id*. at ¶ 8).

After arriving at the Browers' home, Nicholas became involved in an argument with
Melinda Brower that escalated quickly into a physical fight with Nicholas punching Melinda
in the face twice and drawing blood after she confronted him about attempting to sexually
touch her sister Angella Grunza in the car during the trip from the reception; Nicholas
replied to Melinda, "I will touch your pussy too." (Doc. 71 at ¶ 9).[6]

Nicholas then fought with Nathan Brower; the altercation involved Nathan Brower
"tacking [*sic*] Nick to the ground" and Nick grabbing Nathan's head and refusing to let go.

---

[5] Plaintiffs admit SMF ¶ 7 in part and denies it in part. (Doc. 84 at ¶ 7). The Court has reviewed
Plaintiffs' response, which is supported by record evidence, and the deposition transcripts cited by the
Olyphant Defendants, (Doc. 71, Ex. 7 at 22-23; Ex. 13 at 39, 94-95), and has noted here only the portions
of SMF ¶ 7 as to which there is no genuine dispute.

[6] Though Plaintiffs respond by admitting in part and denying in part SMF ¶ 9, the Court has
reviewed their response, (Doc. 84 at ¶ 9), and finds that no part of it constitutes a genuine denial. Plaintiffs
admit that "after arriving at the Brower's [*sic*] home, Nicholas Williams became involved in an argument with
his sister-in-law Melinda Brower." (*Id*.) By way of further response, Plaintiffs state that "the testimony as to
any physical interaction or boorish statements between Nicholas Williams and Melinda Brower are highly
irrelevant, non-probative, prejudicial, and inadmissible especially in light of the fact that Nicholas Williams
was never charged criminally with this purported conduct and same has no relationship to the excessive
force claim and other claims against the Defendants." (*Id*.). Plaintiffs' response contains neither citation to
record evidence, nor a challenge to the credibility or accuracy of the record evidence cited by the Olyphant
Defendants. (*Id*.). The Court deems Plaintiffs to have admitted SMF ¶ 9.

(*Id.* at ¶ 10).[7] It is unclear from the Olyphant Defendants' statement of material fact, (*id.*),

Plaintiffs' response thereto, (Doc. 84 at ¶ 10), and the parties' respective citations to the

record 1) whether another person was involved in the altercation between Nicholas and

Nathan Brower and, if so, who that person was; 2) how the fight came to occur; and 3)

exactly where in the vicinity of the Brower house it occurred.

Nathan Brower disengaged from Nicholas as a police presence arrived on scene;

Nathan Brower testified in his deposition that Nicholas then "got up screaming that he was

going to kill [Nathan Brower] and – he was, like, losing his mind and screaming." (Doc. 71

at ¶ 11).[8]

Nathan Brower further testified that Nicholas

---

[7] Plaintiffs respond by admitting in part and denying in part SMF ¶ 10. SMF ¶ 10 reads, "Nick then fought with Nathan Brower and another man identified only as "Bubb" who were angry that Nick had punched Melinda. This fight occurred on the lawn of the Brower home, extended into the lawn of the neighboring home, and involved Nathan tacking [*sic*] Nick to the ground who grabbed Nathan's head and refused to let go." Plaintiffs admitted that "Nicholas Williams and Nathan Brower had a physical altercation . . . ." (Doc. 84 at ¶ 10). Plaintiffs' response does not address the assertions that Nathan tackled Nicholas or that Nicholas then grabbed Nathan's head and refused to let go. (*See id.*). Additionally, the record citations offered by the Plaintiffs do not call these assertions into question. Thus, the Court will deem these asserted facts admitted.

[8] Though Plaintiffs deny SMF ¶ 11 in its entirety, the Court has reviewed their response, (Doc. 84 at ¶ 11), and the evidence cited by both the Olyphant Defendants and Plaintiffs and finds that there is no genuine dispute as to whether Nathan Brower disengaged from Nicholas as a police presence arrived or that Nathan Brower testified that Nicholas "got up screaming that he was going to kill [Nathan Brower] and – he was, like, losing his mind and screaming." However, in so doing, the Court has discovered that the Olyphant Defendants have liberally, or carelessly, construed their cited evidence as providing support for portions of their SMF ¶ 11. The assertion that there were "up to twenty bystanders" present as police arrived when made in connection with assertions about the altercation between Nicholas and Nathan Brower is misleading. The figure of "up to twenty bystanders" comes from the Deposition of Officer Crowley, (Doc. 71, Ex. 13 at 93), who, by his own testimony, did not arrive on scene until Nicholas was in the back of a vehicle after an altercation with Argenta. (*Id.* at 54-55). Such use of the record is improper in a statement of material facts. The Court also notes that despite their reference thereto, no Tab "I" has been filed of record in this case by Plaintiffs. (*See* Docs. 80-82).

was screaming. The cops came over and he was, like, 'I'll fucking kill you.'
And I'm going to say, he was just screaming that over and over again. And
the cop was like 'please calm down. Please calm down.' And he was like –
he said, 'fuck you.' He said, 'I'll blow up your police station. I'll fuck all your
wives.' And the cop was like, 'please stop.'

(Doc. 71 at ¶ 12; Doc. 84 at ¶ 12).[9] Nathan Brower also testified that "you'd have to

know him to see it. But the anger. Like he gets so angry, it's scary. And when he's

screaming like that, it's– he's like, I'm going to fucking kill you." (Id.).

Defendant and Olyphant police officer Dean Argenta testified that he arrived on

scene with his lights and siren activated and directed his spotlight on the crowd; according

to Argenta, people were yelling and there were several individuals in the street. (Doc. 71 at

¶ 13).[10] Plaintiffs dispute any implication in SMF ¶ 13 that a fight was ongoing at the time

that Defendant Argenta arrived. (Id.; Doc. 84 at ¶ 13).

Nicholas walked towards or charged Defendant Argenta's patrol vehicle with foam

coming out of his mouth. (Doc. 71 at ¶ 14).[11] Defendant Argenta testified that he told

---

[9] Though Plaintiffs admit in part and deny in part SMF ¶ 12, their response includes the statement
that "[i]t is admitted that the statements attributable to Nicholas Williams were only testified to by Nathan
Brower, . . . ." (Doc. 84 at ¶ 12). Despite extraneous citations to other portions of the record, this is all that
SMF ¶ 12 purports to assert and thus the Court deems SMF ¶ 12 admitted in its entirety.

[10] While Plaintiffs deny SMF ¶ 13 in its entirety, (Doc. 84 at ¶ 13), this statement included by the
Court in Part II.A. represents the portions of SMF ¶ 13 that are both supported by the record evidence cited
by the Olyphant Defendants and cannot reasonably be denied by Plaintiffs, who have directed the Court to
the same portion of Defendant Argenta's testimony as did the Olyphant Defendants.

[11] While Plaintiffs deny SMF ¶ 14 in its entirety, the Court has reviewed Plaintiffs' response and
deems admitted the portions of the statement included above in Part II.A. Plaintiffs argue that the section
of Nathan Brower's testimony cited in support of some of the assertions in SMF ¶ 14 actually refers to a
later incident. (Doc. 84 at ¶ 14). However, the assertion that Nicholas charged Argenta's patrol car is
drawn from Argenta's deposition as cited by the Olyphant Defendants, which Plaintiffs do not address in
their response and thus cannot reasonably be said to have denied. Furthermore, while Plaintiffs assert
that, rather than charging the police vehicle, Nicholas stood in the street with Argenta, had a verbal

8

Nicholas to "stop. Get back." (Doc. 71 at ¶ 15; Doc. 84 at ¶15). Officer Argenta then struck Nicholas on the left thigh with his expandable baton. (Id.).

The Olyphant Defendants next assert that Nicholas ran to and got into "Chelsea Williams' vehicle," (Doc. 71 at ¶ 15), while Plaintiffs point to testimony from Chelsea that, after Argenta hit Nicholas, she grabbed Nicholas and walked him to the vehicle, shutting the car door after he had entered, (Doc. 84 at ¶ 15).

Defendant Argenta put the baton away and then approached the car that Nicholas had gotten into. (Doc. 71 at ¶ 16; Doc. 84 at ¶ 16).

Nicholas's aunt Barbara and his three children were in the vehicle at the time. (Id.). Defendant Argenta testified that he asked Barbara to remove the children from the vehicle, (Doc. 71 at ¶16); however, Plaintiffs' apparently dispute that Defendant Argenta ever did so and that Barbara and the children ever exited the car, (Doc. 84 at ¶ 16). Barbara testified in her deposition that no law enforcement officer ever asked her to take the children out of the vehicle and that she and the children "sat in the car the whole time." (Doc. 81, Ex. 7 at 16).

Officer Crowley arrived on scene. (Doc. 71 at ¶ 17).[12] Officer Argenta and Officer Crowley conferred and decided to arrest Nicholas for his drunken and disorderly behavior, approaching the car and ordering him out. (Doc. 71 at ¶ 18; Doc. 84 at ¶ 18).

---

exchange with him, and was not physically aggressive towards him, (Doc. 84 at ¶ 14), a review of the record evidence cited by Plaintiffs does not bear out this assertion. The Court notes that while one page of Argenta's testimony cited to by the Olyphant Defendants refers to Nicholas 'charging' the patrol car, the other cited page indicates that he 'walked' towards Argenta and the car. (See Doc. 71, Ex. 3 at 28, 36).

[12] SMF ¶ 17 reads as follows: "At this point, Officer Michael Crowley arrived on the scene and identified Nick as the individual who had been unruly at the earlier traffic stop of Katie Grunza's cars."

After refusing to exit the car, Nicholas informed Officer Crowley that he would get out

because Officer Crowley was there. (Doc. 71 at ¶ 19; Doc. 84 at ¶ 19).[13] Nicholas exited

the vehicle and was then advised that he was under arrest. (Doc. 71 at ¶ 20; Doc. 84 at ¶

20). The parties dispute what happened next; Defendants claim that Nicholas shoved

Defendant Argenta, who then took Nicholas to the ground by hand and began to struggle

with in order to effect the arrest, (Doc. 71 at ¶ 20), while Plaintiffs deny these claims, (Doc.

84 at ¶ 20). In part, Plaintiffs cite to testimony from Chelsea that, after Nick got out of the

car, "he got whacked maybe one, two – two times with the black baton" on the "lower body."

(Doc. 84 at ¶ 20; Doc. 80, Ex. 1 at 31-32).

Officer Argenta testified that Nicholas ended up on the ground "more on his knees

sitting, not face flat on the ground." (Doc. 71 at ¶ 21; Doc. 84 at ¶ 21). Based on the

testimony of Officer Argenta, the Olyphant Defendants assert that Officer Mackie took the

right side of Nicholas and, along with Officer Argenta, ordered him to stop resisting. (Doc.

71 at ¶ 22).

Plaintiffs, however, deny that Officer Mackie assisted Officer Argenta, (Doc. 84 at ¶

22), pointing to Officer Mackie's testimony that "[t]he only interaction I had with Mr. Williams

---

While Plaintiffs deny SMF ¶ 17 in its entirety, (Doc. 84 at ¶ 17), after a review of their response, the Court finds that they do not appear to actually deny or otherwise dispute the portion of SMF ¶ 17 that indicates Officer Crowley arrived on scene.

[13] Plaintiffs admit in part and deny in part SMF ¶ 19. This statement included by the Court in Part II.A. represents the portions of SMF ¶ 19 that are either admitted by Plaintiffs or supported by the record evidence and not properly denied by Plaintiffs.

was after he was in custody. I assisted in placing him in the police vehicle for transport,"
(Doc. 71, Ex. 11 at 17-18).

The record is unclear as to when Officer Fallon and Officer Mackie each arrived on
scene. For instance, in contrast to Defendant Argenta's testimony, *supra*, Officer Fallon
testified in her deposition that she arrived on scene before Officer Mackie and that she
assisted in taking Nicholas into custody. (Doc. 71, Ex. 12 at 15; *see also* Doc. 84 at ¶ 22).

Officer Argenta testified that Nick was "growling. Making all kind of like moans and .
. . . He was so tensed up if I would have let go of him at any time one of us would have
definitely got hurt. There's not a doubt in my mind. He was ready to flare. We were trying
to take his hands. He was resisting every bit of the way. There was no way that if myself or
Officer Mackie took our hands off him that we were going to get him back in the little control
we had." (Doc. 71 at ¶ 23; Doc. 84 at ¶ 23). Plaintiffs deny the veracity of this testimony.
(Doc. 84 at ¶ 23).

Officer Fallon testified that Nick was "refusing to . . . put his hands behind his back,
stay on the ground. He kept attempting to get up and push off the officers and get away
from them. He was swinging his arms. He was yelling and screaming. He was being
belligerent. He would not calm down. He would not comply to several, multiple commands
to put his hands behind his back . . . . He was swinging his arms at them, trying to get away
from them, trying to push off the ground and the car that he was up against." (Doc. 71 at ¶
23; Doc. 84 at ¶ 23).

Nathan Brower testified that:

> The cops are on top of Nick trying to restrain him, get him to the ground and put his hands behind his back. And Mindy's [Melinda] standing right there with Chelsea. And then Chelsea runs over like screaming and trying to – she went and tried to kick them and Mindy grabbed her from behind and was holding her by the waist. And Chelsea was just like using Mindy to throw her legs and tried to kick the cops anyway. And for a week she couldn't feel her arm because Chelsea was biting her arm so hard. She bit a hole in her – like bit her arm to where, like, she couldn't bend her fingers trying to get out of her thing, to go after the cops.

(Doc. 71, Ex. 9 at 18-19; *see also* Doc. 71 at ¶ 24). Plaintiffs deny that Chelsea kicked any officer or anyone else. (Doc. 84 at ¶ 24).

Officer Crowley told Chelsea to "stay back, stay back." (Doc. 71 at ¶ 24; Doc. 84 at ¶ 24). Officer Crowley held Chelsea, advising her "please do not get involved." (Doc. 71 at ¶ 25; Doc. 84 at ¶ 26).[14] He testified during his deposition that, "Mrs. Williams was attempting to interfere with the arrest" of Nicholas and was "[a]t one point probably inches away" from the officers arresting Nicholas. (Doc. 71, Ex. 13 at 62; *see also* Doc. 71 at ¶ 25).[15]

---

[14] The Court notes that Plaintiffs' Response to Defendants' SMF (Doc. 84) has forty-seven numbered responses, while the SMF itself has only forty-six. After reviewing Plaintiffs' Response in conjunction with the SMF, it appears that Paragraph 25 of Plaintiffs' Response is misplaced, unresponsive to SMF ¶ 25, and unnecessary overall. Thus, the Court has not considered this Paragraph and has treated Paragraphs 26 through 47 of Plaintiffs' Response as responsive to Paragraphs 25 through 46 of the Olyphant Defendants' SMF, respectively.

[15] SMF ¶ 25 reads as follows, "[w]hen Chelsea belligerently raced to within one foot of Officer Argenta and attempted to interfere with the arrest of Nick, Officer Crowley pulled her away from the situation by 'holding her arms trying to keep her back, and I was advising her, "Please, do not get involved."'" Plaintiffs admit this assertion in part and deny it part, responding that "[i]t is admitted that Officer Crowley held Chelsea Williams and **was** advising her 'please do not get involved.' It is specifically denied that Chelsea Williams **belligerently raced to within one foot of . . . Argenta and attempted to interfere with the Arrest of Nick.** There is no factual support for this assertion by the Borough of Olyphant in the referenced pages of Defendant Fallon or Officer Crowley." (Doc. 84 at ¶ 26) (emphasis original). Plaintiffs offer no citations to record evidence. (*Id.*). Again, this is another instance where the

12

Several members of the wedding party and/or other bystanders began advancing on and yelling at the officers. (Doc. 71 at ¶ 26; Doc. 84 at ¶ 27). Officer Crowley ordered these individuals to stay back or he would tase them. (Doc. 71 at ¶ 26; *see also* Doc. 71, Ex. 13 at 64, 98-99).[16]

Officer Argenta testified, "I felt someone on my back scratching my eyes and my face." (Doc. 71, Ex. 3 at 44). The Olyphant Defendants assert that Chelsea jumped on Officer Argenta's back and began "scratching [his] eyes out," (Doc. 71 at ¶ 27), but Plaintiffs deny that she "ever jumped onto the back of Argenta and began scratching his eyes," (Doc. 84 at ¶ 28).

The Olyphant Defendants assert that Officer Fallon tased Nicholas after warning him several times that she would do so if he did not stop resisting arrest, (Doc. 71 at ¶ 28), but Plaintiffs deny this, pointing to testimony that it was Officer Argenta who tased Nicholas, (Doc. 84 at ¶ 29).[17]

---

format of the Olyphant Defendants' SMF has needlessly complicated the Court's analysis of their Motion. The Court has reviewed the record evidence cited by these Defendants and finds that the characterization of Chelsea as 'belligerently racing' towards the officers is unsupported. Plaintiffs appear to have taken umbrage with this editorialization and thus denied the proffered assertion that "Chelsea belligerently raced to within one foot of Officer Argenta and attempted to interfere with the arrest of Nick." However, review of the cited record evidence does support the portion of this assertion that claims Chelsea was within a foot or inches of the officers and that she attempted to interfere with the arrest. Thus, the Court will deem this portion of SMF ¶ 25 admitted. Had the Olyphant Defendants constructed a cleaner and simpler SMF ¶ 25 in the first instance, the Court's analysis would not have been nearly as involved.

[16] Plaintiffs fail to address the actions or statements attributed to Officer Crowley in SMF ¶ 26, *(see* Doc. 84 at ¶ 27); thus, the Court deems them admitted.

[17] SMF ¶ 28 also asserts that after Officer Fallon tased Nicholas, "Officer Mackie was able to handcuff Nick with his handcuffs, [and] get him to his feet . . . ." (Doc. 71 at ¶ 28). Indeed, Defendant Argenta testified that Nicholas "was placed in cuffs by Officer Mack[ie]." (*Id.* (citing Doc. 71, Ex. 3 at 39)). Plaintiffs do not address this portion of the SMF, (Doc. 84 at ¶ 29), and the Court would thus be justified in

Officer Mackie assisted in placing Nicholas in a police vehicle. (Doc. 71, Ex. 11 at

17-18; *see also* Doc. 71 at ¶ 28).[18]

Officer Mackie testified that when he informed Chelsea that she was under arrest,

she began to physically resist. She was flailing her arms. She was kicking, screaming, yelling . . . attempting to pull her arms out of mine and Officer Argenta's grasp. She was attempting to drop her body weight to the ground. The entire time, we were giving her clear and concise commands to stop resisting arrest and to place her hands behind her back. I gave her those commands a minimum of ten times. She never, never ceased in her resistive actions. She continued to resist and began to falter at one point when I was attempting to place her left hand behind her back to be handcuffed by attempting to bite my left hand.

(Doc. 71 at ¶ 30; Doc. 84 at ¶ 31). Officer Argenta testified that after Nicholas was

handcuffed, he went over to where other police officers had Chelsea against a police

vehicle and advised her to "stop resisting, stop resisting, stop resisting." (Doc. 71 at ¶ 30;

Doc. 84 at ¶ 31). Plaintiffs admit that Officer Mackie and Officer Argenta testified as such,

but deny that Chelsea "was ever fighting officers or attempted to bite any officers." (Doc. 84

at ¶ 31).

An officer used a taser on Chelsea; Defendants assert that it was Officer Mackie,

while Plaintiffs assert that it was Officer Argenta. (Doc. 71 at ¶ 31; Doc. 84 at ¶ 32).

---

deeming this part of SMF ¶ 28 admitted. However, the Court will not do so given that it has previously been directed to Officer Mackie's own testimony that "[t]he only interaction [he] had with Mr. Williams was after he was in custody. I assisted in placing him in the police vehicle [ ] for transport." (*See* Doc. 71, Ex. 11 at 17-18).

[18] Plaintiffs fail to address whether Officer Mackie placed Nicholas in the patrol car as asserted by the Olyphant Defendants in SMF ¶ 28, (*see* Doc. 84 at ¶ 29); thus, the Court deems this fact admitted.

14

When asked during her deposition whether neither she nor Chelsea was upset with

the way Nicholas had been treated by the police on the night in question, Melinda Brower

testified as follows: "We believe he was out of his mind."  (Doc. 71 at ¶ 32; Doc. 84 at ¶ 33).

Immediately after testifying in his deposition about Nicholas being tasered, Nathan

Brower testified as follows:

A: So then Chelsea was trying to – there was a female officer there.

Q: What was the female officer doing?

A: I believe she was – I just remember her grabbing Chelsea off Mindy. Because Mindy was holding her and Chelsea was biting her and she was just kicking her feet like trying to kick them.  And then they put her – they were trying to, like, restrain Chelsea over the front of our car because our car was parked a little back further by the back.  So they had her like trying to put her hands behind her back.  It actually, like, scratched the fender of our car because she was, like, trying to, like, fight it.  And then they tasered her and .
. .

Q: Did you see which officer tasered –

A: I have no idea.

Q: Did you hear anything said before she was tasered?

A: No.  That's all everybody was saying was put your hands behind your back. They just wanted people to calm down and everybody was, like, freaking out.

(Doc. 71, Ex. 9 at 21; *see also* Doc. 71 at ¶ 33; Doc. 84 at ¶ 34).

As to Nicholas's actions during the encounter with the police, Nathan Brower testified

as follows:

15

It was him screaming at the top of his lungs, them telling him to stop and relax. I don't know what he was on. He was freaking out. Like purple face screaming. And they were like please calm down. . . . He just wasn't listening. It didn't have to have any force. If he would have stopped screaming right when they arrived, then there would have been nothing that happened. They said, please stop, relax. He was like– just kept screaming the same thing. If he would have been like, okay, they probably would have been like, go home. I mean, I can't say what would have happened. But they let me go home and I was part of it. I stood there and did what they told me to do and walked in my house when it was done.

(Doc. 71 at ¶ 34; Doc. 84 at ¶ 35). Plaintiffs contest the veracity of Nathan Brower's

testimony on these points. (Doc. 84 at ¶ 35).

Nicholas Williams was charged with aggravated assault, simple assault, and

disorderly conduct and plead guilty to disorderly conduct under Section 5503(a)(1). (Doc.

71 at ¶ 35; Doc. 84 at ¶ 36).

Nicholas Williams testified that he received no medical treatment following the June

23, 2012 incident besides having taser prongs removed from his right flank and his back.

(Doc. 71 at ¶ 37; Doc. 84 at ¶ 38).

Nicholas Williams testified that he pled guilty to a charge of disorderly conduct for

intending "to cause public inconvenience, annoyance, or alarm or recklessly creating a risk

thereof, engaged in fighting or threatening or in violent or tumultuous behavior" by failing to

obey police orders, pushing an officer, and fighting with officers while being taken into

custody. (Doc. 71 at ¶ 38; Doc. 84 at ¶ 39).

Christopher Taylor was also arrested. (Doc. 71 at ¶ 41; Doc. 84 at ¶ 42).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where

the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

### A. Excessive Force and Unlawful Seizure § 1983 Claims

Count III of the Third Amended Complaint alleges that Defendant Fallon violated Chelsea Williams's "[c]onstitutional rights to be free from unreasonable and unlawful seizures and free from the use of excessive force." (Doc. 95 at 27). In Count V, Chelsea brings the same claims against Defendant Mackie. (*Id.* at 28-29). Nicholas Williams also

alleges the same claims against Defendant Fallon and Defendant Mackie in Counts IV and VI, respectively. (*Id.* at 28-30).

Claims that police officers used excessive force against a plaintiff, as in the instant case, are properly treated as falling under the Fourth Amendment's prohibition on unreasonable seizures. *See Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) ("The Supreme Court has held that all claims of excessive force by police officers, in the context of an arrest, investigatory stop, or other 'seizure,' should be analyzed under the Fourth Amendment."). Thus, the Plaintiffs' claims for violations of their "[c]onstitutional rights to be free from unreasonable and unlawful seizures and free from the use of excessive force" amount to claims that their respective Fourth Amendment rights were violated.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Fourteenth Amendment extends the Fourth Amendment's prohibition against unreasonable searches and seizures to state officers. *Elkins v. United States*, 364 U.S. 206, 213 (1960). "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)). "A seizure occurs for Fourth Amendment purposes when 'a reasonable person would have believed that he was not free

to leave.'" *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 147 (3d Cir.2005) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). Courts take "a broad approach in considering what constitutes a seizure," *Gallo v. City of Philadelphia*, 161 F.3d 217, 224 (3d Cir. 1998), and consider the totality of "all of the circumstances surrounding the incident." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Because of the importance of the surrounding circumstances, the Third Circuit has held that "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas*, 365 F.3d at 198. The absence of physical injury or contact does not necessarily mean that excessive force was not used. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Here, there can be no doubt that a seizure of each Plaintiff occurred, as both were arrested. The question is, then, whether those seizures and the force used in effecting them were reasonable under the circumstances. As the Dickson City Defendants themselves point out, the Fourth Amendment's objective reasonableness "inquiry is highly individualized and fact specific . . . ." (Doc. 77 at 8 (citing *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015)). Part II of this Memorandum Opinion sets out significant and numerous factual disputes between the parties as to what occurred on the night of June 23, 2012. The nature and size of the fight between Nicholas Williams and Nathan Brower that occurred outside of the Brower house is disputed. There is a material dispute of fact as to whether it was Defendant Argenta who used his taser against one or both Plaintiffs or whether it was Defendant Fallon who tased Nicholas and Defendant Mackie who used his taser against

20

Chelsea. Whether Nicholas shoved Defendant Argenta as Defendant Argenta was attempting to take him into custody is disputed. Whether Officer Mackie was involved in the arrest of Nicholas is disputed. Nicholas's demeanor throughout these events is disputed. Whether Chelsea Williams was attempting to kick the officers arresting her husband is disputed. Whether she jumped on Defendant Argenta's back and began to scratch at his eyes is disputed. The opposing parties in this lawsuit have each structured their case upon the theory that it was individuals on the other side who were acting aggressively and unreasonably. As was the case when evaluating Defendant Argenta's motion for summary judgment on Plaintiffs' § 1983 claims against him, the Court cannot say from the record before it what occurred on the night of June 23, 2012; there are simply too many disputes of material fact. And, since the Court does not know what Defendant Fallon and Defendant Mackie's roles in these events were, it follows that it also cannot determine whether their actions were reasonable under the Fourth Amendment.

The Dickson City Defendants next argue that even if Defendant Fallon or Defendant Mackie violated one or both of the Plaintiffs' constitutional rights, they are "shielded" by qualified immunity. (Doc. 77 at 10-11). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity serves the dual purpose of

holding government officials accountable when their power is exercised unreasonably and protecting those officials from "harassment, distraction, and liability when they perform their duties reasonably." *See id.* "Qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2003) (Kennedy, J. dissenting)). Qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted).

"Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (qualified immunity may turn on disputed issues of fact); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995) ("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination."). The same factual uncertainties that prevent the Court from deciding, as a matter of law, that the arrests of Plaintiffs and the force used by the Dickson City Defendants were reasonable also prevent the Court from finding that they are entitled to qualified immunity. Indeed, these Defendants' argument in their Brief in Support of their Motion for Summary Judgment is premised upon assertions that are far

from proven in this matter. The Dickson City Defendants assert the following as support for

their qualified immunity argument:

> Both of the Plaintiffs exhibited behavior that posed a threat to officer safety.
> Plaintiff Nick Williams refused the officers['] instructions so he could be
> handcuffed and instead chose to thrash about on the ground. Fallon, having
> just arrived on the scene, assessed the situation unfolding before her and the
> [sic] warned plaintiff to cease resisting or he would be tasered. Plaintiff
> ignored her and continued to resist. Defendant Mackie was also confronted
> with resistive behavior in dealing with Chelsea Williams. She attempted to
> interfere with the police attempts to place her husband under arrest. She
> refused to obey officer instructions to stay back and when the officers
> attempted to physically restrain her she responded by flailing her arms,
> thrashing, kicking and attempting to bite the officers.

(Doc. 77 at 11). The Court hopes that embedding these assertions in the context of this

opinion throws into relief their disputed nature; given these questions, holding that the

Dickson City Defendants are entitled to qualified immunity as a matter of law is impossible.

The Court does not know what occurred on the night of June 23, 2012, and, therefore,

cannot say that if one or both of the Dickson City Defendants violated the constitutional

rights of Chelsea or Nicholas Williams, that mistake was reasonable. The Dickson City

Defendants are not entitled to summary judgment on the excessive force claim of either

Plaintiff.

## B. Intentional Infliction of Emotional Distress

In Count X of the Third Amended Complaint, Chelsea Williams raises a claim for

intentional infliction of emotional distress ("IIED") against Defendant Fallon and Defendant

Mackie. In order to prove a claim for IIED, a plaintiff must show that the defendant acted

with "intentional outrageous or extreme conduct" which caused her severe emotional distress. *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005). "Outrageous or extreme conduct has been defined by the appellate courts of this Commonwealth as conduct that is so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Id.* (internal quotation marks omitted). That is,

> it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.

*Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (internal citations and quotation marks omitted). "With regard to the element of outrageousness, it is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery." *Swisher*, 868 A.2d at 1231.

> Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have . . . presented only the most egregious conduct. *See[,] e.g., Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970) (defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents (recognizing but not adopting section 46)); *Banyas v. Lower Bucks Hospital*, 437 A.2d 1236 (Pa. Super. Ct. 1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

24

*Hoy*, 720 A.2d at 754.

"In addition to these substantive requirements, Pennsylvania courts have also established an evidentiary requirement for relief: the 'existence of the alleged emotional distress must be supported by competent medical evidence.'" *Martin v. City of Reading*, 118 F. Supp. 3d 751, 768-69 (E.D. Pa. 2015) (quoting *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (1987)); *see also DeBellis v. Kulp*, 166 F. Supp. 2d 255, 281 (E.D. Pa. 2001) ("To recover for intentional infliction of emotional distress in Pennsylvania, a plaintiff must support the claim of emotional distress with competent medical evidence, in the form of expert medical evidence.") (citing *Hackney v. Woodring*, 539 Pa. 266, 652 A.2d 291, 292 (1994) (per curium)). While it is not necessary that plaintiffs making IIED claims seek treatment for their emotional injuries, they must support the existence and nature of those injuries with competent medical evidence. *Rosen v. Am. Bank of Rolla*, 3 Pa. D. & C.4th 88, 91 (Com. Pl. 1989), *aff'd*, 627 A.2d 190 (1993) ("[P]laintiffs who allege intentional infliction of emotional distress simply must provide competent medical testimony generally supportive of the symptoms, severity, causation, or incidence of the alleged emotional injury in order to sustain their claims.").

In opposition to Defendant Fallon and Defendant Mackie's request for summary judgment on the IIED claim, Plaintiffs correctly point out that these Defendants have violated Local Rule 7.8, which requires that "[n]o brief [ ] incorporate by reference all or any portion of any other brief." (Doc. 88 at 13). Instead of either making their own arguments or setting

forth the Olyphant Defendants' argument, the Dickson City Defendants address Plaintiffs'

state law claims only as follows: "Moving Defendants respectfully join in and incorporate by

reference codefendant Olyphant Borough and Dean Argenta's arguments in favor of

dismissal of Plaintiffs' state law claims." (Doc. 77 at 11). The Court finds this an indolent

and shiftless style of litigation practice, and, as with respect to incorporating the Olyphant

Defendants' Statement of Material Facts, the Dickson City Defendants shall have to accept

both the strengths and weakness of the Olyphant Defendants' arguments as their own.[19]

While the factual issues in dispute would make it difficult to determine whether or not

Defendant Fallon and Defendant Mackie's conduct on the night of June 23, 2012 could be

characterized as extreme or outrageous, Chelsea has failed to meet her evidentiary burden

with respect to this claim and, thus, the Court will grant summary judgment to these Dickson

City Defendant. Plaintiffs have directed the Court to testimonial evidence in the record

which indicates that Chelsea Williams sought medical care for a miscarriage two days after

the incident, (see Doc. 83 at 29), which the Court will reproduce here:

> Q: Other than the EMTS checking you out did you get any follow-up medical
> care for any injuries or problems you believe were caused by this incident?
>
> A: Yes.

---

[19] In the Dickson City Defendants' Reply Brief (Doc. 91), Counsel for these Defendants represents that he "was unaware of [Local Rule 7.8's] prohibition" on incorporating sections of one brief into another, and, in an effort to remedy this deficiency, offers some argument with respect to Plaintiffs' state law claims. (Doc. 91 at 2-4). It is the Court's view that the Dickson City Defendants' have waived the opportunity to make any arguments on these claims other than those made by the Olyphant Defendants. However, the Court has reviewed the arguments in the Reply Brief (Doc. 91) and they do not change this Court's rulings on any of the state law claims raised by one or both of the Plaintiffs against one or both of the Dickson City Defendants.

Q: What is that?

A: It was, I want to say, two days after the incident – after the wedding night I had abnormal bleeding. It [sic] was brought to the hospital with my mom and it was a miscarriage.

Q: Did you have any prior pregnancies that resulted in miscarriage also?

A: No.

Q: None?

A: No.

Q: Did any doctor tell you that he believes that [t]he occurrences of that evening caused your miscarriage?

A: No.

Q: Other than that treatment, any other treatment that you think you received after this incident that was caused by the incident?

A: No.

(Doc. 80, Ex. 1 at 48-49). This testimony itself does not constitute competent medical

evidence that this plaintiff suffered emotional distress as a result of the events of June 23,

2012. Plaintiffs have not pointed the Court to medical records from this hospital visit, nor

have they adduced expert opinion evidence on the subject. And by her own testimony,

Chelsea Williams received no other treatment related to the events of June 23, 2012, which

indicates to the Court that there is no medical evidence supporting her IIED claim in the

record. Furthermore, it is unclear from this testimony itself whether her visit to the hospital

was indeed causally connected to that incident. Defendant Fallon and Defendant Mackie

are thus entitled to summary judgment on Chelsea Williams's IIED claim. *See, e.g.*, *DeBellis*, 166 F. Supp. 2d at 281 ("Because plaintiffs have not offered any medical evidence to support their [IIED] claim, we grant summary judgment on this claim in favor of Officers Bennis, Kulp, Morris and Moyer."); *Martin*, 118 F. Supp. 3d at 768-69 (E.D. Pa. 2015) ("Unsubstantiated allegations do not amount to competent medical evidence, and Plaintiff's failure to direct the Court to any such evidence to support those allegations is fatal to his claim."); *Paith v. Cty. of Washington*, 394 F. App'x 858, 861 (3d Cir. 2010) (holding that the district court did not err in granting summary judgment in favor of defendant where plaintiff "did not adduce any medical evidence in support of her claim.").

## C. Assault and Battery

In Count XI of the Third Amended Complaint, Chelsea Williams raises a claim for "assault and battery" against Defendants Fallon and Mackie under Pennsylvania state law. In Count XII, Nicholas Williams also raises a claim for "assault and battery" against each of these Dickson City Defendants. As Plaintiffs recognize, (*see* Doc. 83 at 30), Counts XI and XII each contain within them two separate tort theories. To state a claim for assault, Pennsylvania law requires a showing of "an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Cucinotti v. Ortmann,* 159 A.2d 216, 217 (Pa. 1960); *see also* Restatement (Second) of Torts § 21(1) (1965). "[T]he actor must be in a position to carry out the threat immediately, and he must take some affirmative action to do so." *Id.* To

establish a claim of battery, a person must act intending to cause a harmful or offensive

contact with another person, or an imminent apprehension of such contact, and an offensive

contact with the person is the direct or indirect result. *Herr v. Booten*, 580 A.2d 1115, 1117

(Pa. Super. Ct. 1990); Restatement (Second) of Torts § 18(1) (1965). A plaintiff is not

required to show actual physical injury to establish a battery, only an unpermitted and

therefore "offensive" contact. *Montgomery v. Bazaz–Sehgal*, 742 A.2d 1125, 1131 (Pa.

Super. Ct. 1999), *aff'd*, 798 A.2d 742 (Pa. 2002). The Dickson City Defendants, again by

improperly incorporating by reference the arguments of the Olyphant Defendants with

respect to Plaintiffs' state law claims, (Doc. 77 at 11), rely on the following propositions of

law from *Renk v. City of Pittsburgh*, 641 A.2d 289 (1994), to argue that they are entitled to

summary judgment with respect to these counts:

> A police officer may use reasonable force to prevent interference with the
> exercise of his authority or the performance of his duty. In making a lawful
> arrest, a police officer may use such force as is necessary under the
> circumstances to effectuate the arrest. The reasonableness of the force used
> in making the arrest determines whether the police officer's conduct
> constitutes an assault and battery.

*Id.* at 293; (Doc. 72 at 27). Because disputes of material fact prevent the Court from judging

the reasonableness of Defendant Fallon and Defendant Mackie's actions with respect to

Chelsea and Nicholas Williams, *see supra* Part IV(B)(1), the Court is also prevented from

determining whether each of their conduct constitutes an assault and battery. The Court will

deny Defendant Fallon and Defendant Mackie's Motion for Summary Judgment with respect

to Counts XI and XII.

### D. Loss of Consortium

The Dickson City Defendants, again by improperly incorporating by reference the arguments of the Olyphant Defendants with respect to Plaintiffs' state law claims, (Doc. 77 at 11), argue that Chelsea and Nicholas Williams's claims against Defendant Fallon and Defendant Mackie for loss of consortium (Count XIII and Count XIV) do not lie because loss of consortium is a derivative claim and the other state law claims made against them are "invalid," (Doc. 72 at 28). Because Chelsea and Nicholas Williams's state law claims for assault and battery are allowed to proceed against the Dickson City Defendants, the Court will not grant summary judgment on this basis with respect to the loss of consortium claims.

### V. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Dickson City Defendants' Motion for Summary Judgment (Doc. 73). A separate Order follows.


Robert D. Mariani
United States District Judge